## B. EARLE BITHER *vs.* JUSTIN E. PACKARD.

## Kennebec.  Opinion October 13, 1916.

*Action for money had and received, equitable in its nature. Rule as to unconscionable contracts.*

This is an action for money had and received, by which the plaintiff seeks the recovery of money paid to the defendant, the payment of which was induced, as alleged by plaintiff, by duress, the illegal and unjust advantage taken by defendant of plaintiff's financial needs and condition and by reason of an unconscionable contract or agreement, which was void or voidable and without consideration or any adequate consideration.

As a general rule, where money has been received by a defendant under any state of facts which would in a court of equity entitle the plaintiff to a decree for the money, when that is the specific relief sought, the same state of facts will entitle him to recover in an action for money had and received.

There may be such unconscionableness or inadequacy in a bargain as to demonstrate some gross imposition or some undue influence; and in such cases courts of equity ought to interfere, upon the satisfactory ground of fraud.  But then such unconscionableness or such inadequacy should be made out as would (to use an expressive phrase) shock the conscience, and amount in itself to conclusive and decisive evidence of fraud.  And where there are other ingredients in the case, of a suspicious nature, or peculiar relations, between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud.

In case of fraud, as a general rule, the party defrauded must act with promptness on discovery of the fraud.  But in case of that species of fraud involving undue influence or oppression, time does not begin to run against the injured party until he is emancipated from the dominion under which he stood at the date of the transaction.·

Where there is nothing to be done by the plaintiff to place the defendant in statu quo, the action for money had and received is in itself a rescission as well as a demand.

Interest, upon the principles of the common law, is to be allowed where the law by implication makes it the duty of the party to pay over the money to the owner without previous demand.  Where it was obtained and held by fraud, interest should be calculated from the time it was received.

Judgment may be entered for the plaintiff for the sum of $8200. with simple interest at six per cent per annum upon each of the payments of $200.

from the dates when respectively made, to be cast by the clerk of the Superior Court, to the day of the entry of judgment.

Action of assumpsit under a count for money had and received to recover of defendant certain sums of money paid by plaintiff to defendant. Plaintiff alleged that payments so made to said defendant were under duress and on account of illegal and unjust advantage taken by defendant of plaintiff's condition. Defendant pleaded general issue. At close of testimony, by agreement of counsel, case reported to Law Court for its determination upon so much of the evidence as legally admissible. Judgment for plaintiff.

Case stated in opinion.

*E. M. Thompson,* for plaintiff.

*S. & L. Titcomb,* and *Andrews & Nelson,* for defendant.

SITTING: SAVAGE, C. J., CORNISH, KING, BIRD, HALEY, PHILBROOK, JJ.

BIRD J. This is an action for money had and received by which the plaintiff seeks the recovery of money paid to the defendant, the payment of which was induced, as alleged by plaintiff, by duress, the illegal and unjust advantage taken by defendant of plaintiff's financial needs and condition and by reason of an unconscionable contract or agreement which was void or voidable and without consideration or any adequate consideration.

At the conclusion of the evidence, the case was withdrawn from the jury and reported to the Law Court for determination upon so much of the evidence as is legally admissible.

From the testimony of the plaintiff it appears that at about the age of thirteen years, being without a home, he came from a distant part of the State, upon the invitation of his aunt, the wife of defendant, to Augusta where defendant then, and has since, resided. For a year he lived without expense to him, in the home where his aunt and uncle lived. The plaintiff was thereafter absent from Augusta for the period of a year. He then returned to Augusta where, boarding at various places and paying all his expenses from his earnings, he attended the grammar and high schools, from the latter of which he graduated at the age of twenty. After his

graduation he' was variously employed at Augusta, chiefly a clerk or salesman, until the time of the transaction which gave rise to the present suit.  During the five or six years next preceding this transaction, he was clerk in the drug store of one Means and then of one Burns who purchased the store of the common law assignee of the former.  On the twenty-eighth day of August, 1911, the plaintiff bought a house for a home.  He paid on account of the purchase $900, which he had saved and obtained from the defendant a loan of $1,200 to complete the purchase.  To secure the loan he gave defendant his note for the amount payable in monthly payments of $20 with interest at 6 per cent.  Plaintiff sought and defendant gave advice as to the desirability of the purchase.

On the sixth or tenth of November, 1911, Mr. Burns by whom he was then employed as clerk, became dissatisfied and offered to sell plaintiff his stock and business for the sum of seven thousand dollars.  The plaintiff at once sought the advice of defendant and his aid in obtaining the necessary money, if the latter approved the purchase.  The defendant took the matter under consideration and later gave his approval and on Saturday, November 18, 1911, informed plaintiff that he could loan him the necessary funds, the plaintiff to include in the notes to be given by him therefor, the sum of $200 for board of the plaintiff some thirteen years before. To these terms plaintiff agreeing, on Monday, November 20, 1911, Burns gave his bill of sale of the stock of goods and good will of the business to Bither for which defendant paid him seven thousand dollars.  Plaintiff immediately thereafter gave to defendant his note for two thousand dollars on demand, with interest at the rate of seven per cent and secured the same by second mortgage of his home and a note for fifty-two hundred dollars payable on demand with interest at the same rate and a mortgage as security for the last named note upon the property sold him by Burns.  This mortgage provided for possession in the mortgagor until the mortgagee "shall consider it for his interest to take possession under this bill of sale, after default of payment.  .  .  ."

Four or five days later, November 25 or 26, the defendant called upon plaintiff and told him that under the circumstances he thought it no more than fair that he should have a partnership in the business.  The plaintiff expressed his disapproval of partnerships but

said that if defendant would have a partnership agreement drawn up, he would think it over and give his answer later. It may be inferred from plaintiff's testimony that plaintiff shortly after the partnership proposition was made, declined it. Up to this time plaintiff says that the relations between defendant and himself were pleasant and cordial and he had found defendant in his dealings with him a just man. On the thirteenth of December following, defendant had an interview with plaintiff in the cellar of his store. The defendant upbraided him for ingratitude, stated that he had used him mean and said that the plaintiff must give him an agreement to pay him two hundred dollars per month while in business, as his share of profits under the proposed partnership, or he would foreclose his mortgages, take all plaintiff had and ruin him financially, and that he enforced his demand by violent and profane language and a threatening manner. On cross examination plaintiff admits that defendant made the alternative proposition to pay a certain sum for his trade and employ him at a stated wage thereafter. The plaintiff finally in fear, as he states, of financial undoing, yielded and agreed to sign such agreement as defendant proposed and both repaired to the office of the attorney of defendant where an agreement under seal was prepared which both parties executed.

By this agreement the plaintiff binds himself to pay the sum of $200 to defendant on the twentieth day of December, 1911, and on the like day of each succeeding month so long as he carries on or is engaged in the drug business, and in case of his desire to retire from or sell the drug business, to give the first option of purchase to defendant upon certain terms set forth and defendant agrees that he will not demand payment of the sum of $7000 advanced by him to plaintiff so long as the latter "fulfills his agreements as specified in items one and two of this indenture and so long as said Bither shall pay the interest on said seven thousand dollars when due." The plaintiff testifies that he executed this agreement under fear of financial downfall and destruction induced by the threats of the defendant. Either on the day of the execution of the agreement of December 13, or on the following day, he sought, apparently in consequence of defendant's demand for an assignment of the existing lease of the store, a modification of the agreement and a

new indenture was drawn which was executed by both parties to the suit on the fifteenth day of December, 1911. Reciting the existence of the mortgage to secure the sum of $7,000, Bither agrees that the assignment of the lease of the store may run to defendant and to pay defendant the rents by the lease reserved and defendant agrees that Bither shall carry on the drug business, that he is the owner and manager of the business free from intervention of Packard but subject to his legal rights, that when the sum of $7,000, has been paid the lease shall be reassigned to Bither and that he will not demand payment of such sum so long as Bither fulfills all his agreements.

The plaintiff made his first payment under the agreement of December 13, 1911, on the twentieth day of December next following and continued such monthly payments until that payable in April, 1915, was paid. He testifies that each of these payments was made under the influence and by reason of the threats and fear which he claims induced the agreement of December 13, 1911.

The defendant, who is about twenty-six years older than plaintiff testifies that at the outset of the negotiations between him and plaintiff for a loan wherewith to purchase the business of Burns, he suggested on the day the matter was first broached, November 16, 1911, that he should have one-half of the profits and that later on the same day in the cellar of his house an equal partnership was agreed upon and that he, the defendant, was to have partnership papers drawn; that on Sunday, November 19, he caused a memorandum for the drawing of such an agreement to be made, that he exhibited the paper to plaintiff on the morning of November 20; that the plaintiff said "I don't see but that is all right;" that the plaintiff said that Burns was desirous of being released from his agreement to sell; that defendant then said "if that is the case it won't do to ask him to give us a bill of sale as a partnership . . . it would give him an excuse to back out. We better have it drawn up in your name and then after we get rid of Burns we can go into partnership as agreed." The defendant did not speak of it again for a week when he states plaintiff said he had decided not to have a partner. "The interview was closed abruptly." "I was mad and didn't want to do any business while I was mad." Upon cross examination defendant was asked if the

fact that Mr. Burns was around the store interfered with completing his transaction with Mr. Bither and he replied, "Well, because I in a way was deceiving him, I didn't want him to think we were putting up a job to get his place away." And, later, speaking of Burns and the transaction, he said, "He might think it was kind of underhanded." The matter of partnership was not again brought up by defendant. On the thirteenth of December, defendant, in the cellar of the store made plaintiff an offer of a certain sum for his trade with Burns and of a certain sum per week for work for him or, "if you want the business, you give me $200 a month for my share of the net income, one-third of the net profits, and you can own the business, or I shall demand my money, as the note is on demand, and I shall take possession as soon as the law will allow me to." To this plaintiff replied, as defendant states, "well you have got me crimped and I have got to give you $200." "I said 'No you haven't. You can take $1,200 and a salary of $25 a week and I will take the business.' He said 'I want the business and will give you $200 a month if you won't foreclose, won't demand your money.'" The defendant, as he says then went alone to the office of his attorney to have an agreement drawn.

Defendant further testified that the lease under which Burns occupied the store was not mentioned by him and plaintiff until the bill of sale and mortgages had been made; that he understood the lease was to be assigned to Bither and that later on the twentieth of November, at the office of the attorney of Mr. Burns, it was arranged that the lease be assigned to defendant.

We find no evidence that plaintiff's knowledge of the situation was supplemented by the advice of counsel, upon full knowledge of the facts, much less by full and complete advice and instruction. And while it is probably immaterial, we are unable to conclude upon the evidence that the matter of a partnership was agreed upon, as claimed by defendant before the transactions of the twentieth of November, 1911. That the agreement of December 13, 1911, was unconscionable and shocking to the conscience must be apparent. Treating the payment of two hundred dollars per month or twenty-four hundred dollars a year as interest, it afforded a rate of .33 per cent, which necessarily increased with each partial payment made and which, with the interest payable on the notes,

made an initial rate of .40 per cent. Considered as a payment in consideration of forbearance it is equally shocking. Nor should it be overlooked that the agreement was to be in force not so long as the plaintiff was indebted but "so long as he carries on or is engaged in the drug business."

The court is also of the opinion that in making the indenture of December fifteen, 1911 and the monthly payments of $200 under the indenture executed two days earlier, the plaintiff continued under the influence of the threats and oppression of defendant which induced the plaintiff to become party to the earlier indenture.

The principles of law covering the case are, we believe, well established. It is elementary law that when one person has in his possession money which in equity and good conscience belongs to another, the law will create an implied promise upon the part of such person to pay the same to him to whom it belongs, and in such cases an action for money had and received may be maintained. This form of action is comprehensive in its reach and scope and, though the form or proceeding is in law, it is equitable in spirit and purpose and the substantial justice which it promotes renders it favored by the courts. It lies for money paid under protest, or obtained through fraud, duress, extortion, imposition or any other taking of undue advantage of the plaintiff's situation, or otherwise involuntarily and wrongfully paid. Where the defendant is proved to have in his hands the money of the plaintiff, which ex aequo et bono, he ought to refund, the law conclusively presumes that he has promised to do so, and the jury are bound to find accordingly, and, after verdict, the promise is presumed to have been actually proved. *Mayo* v. *Purington,* 113 Maine, 452, 455-456.

A person induced by fraud, to enter into a contract under which he pays money, may at his option, rescind the contract and recover back the price, as money had and received. *Garland* v. *Spencer,* 46 Maine, 528, 530.

It has been held that the action for money had and received being an equitable remedy, lies generally where a bill in equity will lie, and that decisions therefore, in chancery which recognize the principle may be justly held to sustain it. *Culbreath* v. *Culbreath,*

7 Ga., 64. 50 Am. Dec. 375, 381. This has been thought, however, to be too broad and indefinite a statement. The better rule is that laid down in *Moore* v. *Mandelbaum,* 8 Mich., 433, 448, to the effect that as a general rule, where money has been received by a defendant under any state of facts which would in a court of equity entitle the plaintiff to a decree for the money, when that is the specific relief sought, the same state of facts will entitle him to recover in an action for money had and received. "We do not mean to say there are no exceptions to this rule, standing upon some rule of policy or strict law, in peculiar cases such as money wrongfully recovered upon a judgment which remains unreversed . . . or where there is a special agreement still open and unperformed." See 2 R. C. L. p. 778.

In *Woodman* v. *Freeman,* where the bill prays the cancellation of certain instruments procured by fraud and the repayment of money, the payment of which was induced by the same fraud, the court after stating the elementary principle that a court of equity may rescind a conveyance or contract which has been procured by fraud, when a proper case for it has been presented, says that the court may also give relief by compensation or damages in sundry classes of cases which it enumerates and among them the case "when a contract or conveyance is properly set aside or rescinded under circumstances requiring that some compensation should be made to one of the parties to adjust the equities and do complete justice." 25 Maine, 530, 537, 542, 543. *Piscataquis etc. Ins. Co.* v. *Hill,* 60 Maine, 178, 184.

In the case of *Chesterfield* v. *Janssen,* 2 Ves., 155, Lord Chancellor Hardwicks, having asserted the undoubted jurisdiction of equity to relieve against every species of fraud, enumerates four classes of fraud, three of which are as follows: "1. Then fraud, which is dolus malus, may be actual, arising from facts and circumstances of imposition; which is the plainest case. 2. It may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other; which are unequitable and unconscientious bargains; and of such even the common law has taken notice; for which, if it would not look a little ludicrous might be cited 1 Lev. 111.

*James* v. *Morgan*. A 3d, kind of fraud is, which may be presumed from the circumstances and condition of the parties contracting; and this goes further than the rule of law; which is, that it must be proved, and not presumed; but it is wisely established in this court to prevent taking surreptitious advantage of the weakness or necessity of another; which knowingly to do is equally against conscience as to take advantage of his ignorance; a person is equally unable to judge for himself in one as the other." This statement has been approved, unchanged by the courts and text writers to the present day. *Prudential Ins. Co.* v. *Lachance,* 113 Maine, 550, 555.

There may be such unconscionableness or inadequacy in a bargain as to demonstrate some gross imposition or some undue influence; and in such cases courts of equity ought to interfere, upon the satisfactory ground of fraud. But then such unconscionableness or such inadequacy should be made out as would (to use an expressive phrase) shock the conscience, and amount in itself to conclusive and decisive evidence of fraud. And where there are other ingredients in the case, of a suspicious nature, or peculiar relations, between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud. 1 Sto. Eq. Jur. § 246. See also Kerr Fr., 187. Hence it is, that even if there be no proof of fraud or imposition, yet, if upon the whole circumstances, the contract appears to be grossly against conscience, or grossly unreasonable and oppressive, courts of equity will sometimes interfere and grant relief, although they certainly are very cautious of interfering unless upon very strong circumstances. *Prudential Ins. Co.* v. *Lachance,* supra.

As between mortgagor and mortgagee, while the former by a voluntary agreement subsequent to the mortgage transaction may convey his equity and all rights to the latter, yet if such subsequent agreement is procured by fraud, oppression or undue influence on the part of the mortgagee, equity will set aside the conveyance. *Russell* v. *Southard,* 12 How. 138, 154; *Villa* v. *Rodriguez,* 12 Wall., 323, 339; *Reed* v. *Reed,* 75 Maine, 264, 272.

And where the holder of notes payable on demand and secured by mortgages upon all the property of another threatens immediate action upon his notes and the financial ruin of such other unless

the latter pay additional interest upon the loan, making the rate grossly usurious, or make payments of money unconscionable in amount for forbearance, we have no doubt a court of equity would equally grant relief. We are unable to distinguish between the case of a mortgagor conveying his equity to the mortgagee by reason of the commanding position of the latter and the weakness and inexperience of the former and a mortgagee whose notes are payable on demand, who threatens immediate demand unless the mortgagor undertakes to pay him an exorbitant sum for forbearance.

In the case of fraud as a general rule, the party defrauded must act with promptness on discovery of the fraud. But in case of that species of fraud involving undue influence or oppression time does not begin to run against the injured party until he is emancipated from the dominion under which he stood at the date of the transaction. The objection of time is removed so long as the dominion or undue influence which vitiated the transaction is in full force. Kerr Fr., 311 and cases cited. So where a transaction is vitiated at its inception by undue influence or by oppression, pressure or constraint, confirmation induced by undue influence or oppression, pressure or constraint or by a continuation merely of the influence of the original transaction, operates as nothing and is unavailing. If an independent legal advisor be employed, it will be assumed that he had satisfied himself before approving of the transaction, that it was for the benefit of his client to approve it. Kerr Fr., 297, 298. See also Ward's Pollock on Contracts, 769, 770.

Or as otherwise stated "unless it is clear that the will of the injured party was relieved from the dominant influence under which he acted or that the imperfect knowledge with which he entered into the contract was supplemented by the fullest assistance and information, an affirmation will not be allowed to bind him nor will time be allowed to run against him, 9 Cyc., 464.

To constitute a confirmation the act must have been done with that intention by one who was not under the influence of the previous transaction and with a knowledge of its invalidity. *Rau v. Von Zedlitz,* 132 Mass., 164, 168.

Where there is nothing to be done by the plaintiff to place the defendant in statu quo, the action for money had and received is

in itself a recission as well as a demand; *Frye Pulpwood Co.* v. *Ray,* 114 Maine, 272, 275. *Hunt* v. *Nevers,* 15 Pick., 500, 505. *Hunter* v. *Peaks,* 74 Maine, 363.

Interest, upon the principles of the common law, is to be allowed where the law by implication makes it the duty of a party to pay over money to the owner without previous demand. Where it was obtained and held by fraud, interest should be calculated from the time when it was received; *Dodge* v. *Perkins,* 9 Pick., 368, 388.

Judgment may be entered for the plaintiff for the sum of $8,200 with simple interest at six per cent per annum upon each of the payments of $200 from the dates when respectively made, to be cast by the clerk of the Superior Court, to the day of the entry of judgment.

*So Ordered.*