José R. Rivera, Plaintiff, *v.* Banco Industrial de Puerto Rico, Defendant and Appellant; Julio C. García, Intervener and Appellee.

No. 6215. Argued January 22, 1935.—Decided March 20, 1936.

*C. Santana Becerra* for appellant. *Antonio R. Barceló, Jr.,* for appellee.

Mr. Justice Hutchison delivered the opinion of the court.

██ García appeared as intervener in an action brought by Rivera against El Banco Industrial de Puerto Rico and obtained a judgment against the bank for $750 with legal interest from November 18, 1930. The only error assigned is that the district court erred in overruling a demurrer for want of facts sufficient to constitute a cause of action. The pertinent portion of the complaint in intervention reads as follows:

"3. That about the month of April 1929, the intervener had in the Banco Industrial de Puerto Rico $925, of which sum the Banco Industrial appropriated $175 to be paid on account of a promissory note which, indorsed by the intervener and Juan Nogueras, had matured and was held by the bank.

"4. That the Banco Industrial had used and applied the balance, $750, to reimburse itself for certain expenses incurred by the said bank in repairing house No. 29 of Flores Street which had been acquired by the bank in a judicial sale arising out of an action prosecuted by Esteban Alvarez Garriga against José Dolores Cruz (civil case No. 7575 *in re.* foreclosure of mortgage) and also to reimburse itself for judicial expenses, costs and attorney's fees inclusive, incurred by reason of said suit No. 7575.

"5. The intervener alleges that the president of the Banco Industrial asked him to call at the bank where he was told that the directors of the bank had decided to use the $925 belonging to the intervener in the manner above stated and that, in accordance with such decision, the said $925 had been used as aforesaid; that the intervener objected to such proceeding as being unfair and unlawful and that the president of the Banco Industrial then told the intervener that if he did not consent to let the $925 be applied as already stated, the bank would immediately proceed to collect through judicial action and attachments a big sum of money which the intervener owed the bank and was secured *in solidum* by friends and business connections who had indorsed and backed him. The intervener alleges that because of the threats from the president of the bank and the compulsion used by the latter against him and fearing that if he failed to comply with the wishes of the bank directors, both he and his friends would be seriously injured in their credit and prestige, if judicial action was taken against them for the collection of the obligations to the bank due and outstanding, and because he knew Schluter well and knew that the latter would carry out his threats, he complied with the wish of the directors of the Banco Industrial.

"6. The intervener alleges that, had it not been for the reasons set forth in the preceding fifth paragraph, he would never have consented to the unlawful use of his $750 for the reimbursement of the expenses mentioned in the preceding fourth paragraph and to the payment of which the intervener was not bound in any way.

" '7. The intervener alleges that the bank unjustly enriched itself at his expense by the sum of $750 that was applied to pay for the said repairs to the house in Flores Street and to the payment of expenses and attorney's fees in civil case No. 7575, and that for that

reason the Banco Industrial should, under the law, return the said $750 to the intervener.

"8. That the intervener filed with the receiver of the defendant bank the claim brought in this complaint and that the receiver refuses to admit the same and to pay him."

From the order overruling the demurrer we take the following extract: (Italics ours.)

". . . Admitting, as we must, the facts alleged in the complaint, we must conclude that Schluter went beyond his rights in obtaining from the plaintiff herein his consent to appropriate that which did not belong to Schluter by threatening to collect judicially other obligations already matured of García in favor of the bank. The paragraph from Manresa quoted in full by the attorney for the intervener seems to apply. It is as follows:

" 'It is also an essential requisite that the threat is made of injury; and this latter single word will be only considered by us, disregarding the adjectives qualifying it, because as the lawmaker does not consider as injury that which the law itself protects or imposes, we imply therefrom the important consequence that the injury must be unlawful, and that he does not intimidate who confines himself to invoke his right without abusing it. Thus, a debtor can not allege that he consented to pay upon being threatened with legal proceedings and payment of costs, and that his consent was invalid. But it will be invalid if the creditor, going beyond his right, *had wrested from his debtor, by threatening him with legal proceedings, a novation of the contract or the acknowledgement of a larger indebtedness.*' " 8 Manresa, *Comentarios al Código Civil*, 4th ed. 1929, 596.

If Manresa was right the district court was right. Manresa, we think, was substantially right. Whether or not his statement of the law or of what the law should be might be improved by some restatement is not a pivotal point. The result in the district court was right and its judgment should not be disturbed.

The only authorities cited by appellant in its brief are *Burke* v. *Gould.* 105 Cal. 282; *Rivera* v. *Manufacturers Life Ins. Co.,* 34 P.R.R. 239, and V Williston on Contracts 4500, section 1606. What was said in these two cases and all that

has been said in other similar cases must be read in the light of the facts before the court in each particular case. We have no quarrel with the doctrine laid down in the two cases relied upon by appellant as applied to the facts set forth in the two opinions. The facts in the case at bar as set forth in intervener's complaint are quite different. Appellant quotes form Williston the first five sentences of section 1606. That section must be taken as a whole and in conjunction with section 1607, which reads as follows:

"Means in themselves lawful must not be so oppressively used as to amount to an abuse of legal remedies. Though attachment is in itself lawful, if an attachment is excessive, or of perishable property, or is made under circumstances which make it difficult for the defendant to avoid yielding to any demands the use of the attachment for the purpose of enforcing extortionate or collateral demands is abusive, and transactions coerced by such means are voidable. Under similar circumstances a threat to apply for a receiver of a corporation has been held duress of one who was interested financially therein and whose reputation would be injuriously affected by the application. Even a threat of ordinary litigation may be made under such circumstances as to render the threat wronful as a means of coercion, and the transaction induced thereby voidable. Thus, where one of the parties is in such a position as to be easily dominated by the other, or is old and weak-minded, a transaction induced by such a threat may be avoided. Where, however, ordinary legal procedure is used or threatened by one who believes he has a claim of the kind for which such procedure was provided, there must doubtless be some actual or threatened abuse of process. What amounts to such an abuse is not susceptible of exact definition."

In the Restatement of the Law of Contracts as adopted and promulgated by the American Law Institute, Vol. II, section 492, at page 938, we find the following definition of duress:

"Duress in the Restatement of this subject means:

"(a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or

"(b) any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement."

Paragraph *g* of the comment reads as follows:

"*g*. Acts or threats cannot constitute duress unless they are wrongful, even though they exert such pressure as to preclude the exercise of free judgment. But acts may be wrongful within the meaning of this rule though they are not criminal or tortious or in violation of a contractual duty. Just as acts contracted for may be against public policy and the contract vitiated for that reason, though the law imposes no penalty for doing them, so acts that involve abuse of legal remedies or that are wrongful in a moral sense, if made use of as a means of causing fear vitiate a transaction induced by that fear, though they may not in themselves be legal wrongs."

Section 493 classifies the means whereby duress may be exercised. Among other wrongful acts not coming clearly within any of the groups included in this attempt at general classification we find at page 949 the following example:

"A, a creditor of B, threatens B to bring proceedings to have a guardian appointed for B, and take charge of his property unless he will sign a note for A's claim. B is an aged person of infirm will, and induced by fear signs the note. There is duress."

In *Foote* v. *De Poy*, 68 L.R.A. 302 the first paragraph of the headnotes reads as follows:

"The surrender of the bulk of his property, by a man who has become mentally infirm, for the benefit of a child of his divorced wife, to secure the withdrawal of proceedings by the wife to place him under guardianship, will be set aside."

There was no question about the technical legal right of the divorced wife to obtain the threatened appointment of a permanent guardian. A temporary guardian had already been appointed. De Poy, the former husband, had been represented by counsel when he sold his equity in a piece

of mortgaged property and paid over the proceeds in order to avoid a continuance of the guardianship proceedings. The Supreme Court of Iowa, without deciding the question as to De Poy's alleged incompetency at the time of the transaction held that the guardianship proceeding and the threatened appointment of a permanent guardian was a flagrant abuse of a legal remedy. The gist of the decision may be found in the following paragraph: (Italics ours.)

"In reaching this conclusion, we may say it is very probable that no person active in securing the contract was moved by any malicious or wanton purpose to harass or despoil this feeble and broken old man. It may, indeed, be assumed that the divorced wife believed he was liable to waste or dispose of the remnant of his property, and that her motive in instituting the proceedings and obtaining the contract was not to enrich herself, but to obtain the best possible provision for her child. The motive was laudable enough, but the means by which that end was accomplished cannot be upheld. William De Poy was either mentally competent or incompetent. *If competent and the proceedings against him were begun to compel him to give up a part of his property, it was a flagrant abuse of the machinery of the law for the purpose of securing an unconscionable advantage.*"

The divorced wife had at least some semblance of a claim against De Poy for the maintenance, support, and education of the child. In the instant case the bank had not the shadow of a claim against García for reimbursement of expenditures made by it in connection with the mortgage foreclosure proceeding and the repairs on the house at number 29 Calle de las Flores referred to in the complaint. In the instant case there is not even the extenuating circumstance of a laudable motive. In these as in all other statements concerning the facts before us we are speaking, of course, of the facts set forth in intervener's complaint. That complaint and the demurrer were the only pleadings in the district court at the time of the overruling of the demurrer and the district court in disposing of the demurrer was bound to accept as true the facts set forth in the complaint. In considering appellant's

assignment of error this court is in the same position as was the district court on overruling the demurrer. There is no bill of exception, statement of the case or transcript of the evidence, but even otherwise, we would be confined (as far as the single question raised by appellant is concerned) to the facts before the district court at the time of overruling the demurrer. If, however, we should take into consideration the answer filed by the receiver, in conjunction with the final judgment and with the statement of the case and opinion filed by the district judge, there would be no satisfactory ground for a conclusion that the bank had any laudable motive or any kind of a claim against García aside from the obligations which were to be made the basis of the threatened legal action.

In *Weber* v. *Kirkendall*, 39 Neb. Rep. 193, the court said in part (italics ours):

"Magnus Weber, on the 3rd day of October, 1888, purchased of Flodman & Bruce a retail shoe store in the city of Omaha, and assumed an indebtedness of $820.71 which his vendors then owed Kirkendall, Jones & Co. Flodman & Bruce had purchased this store of Johnson & Flodman, and they purchased the store of Thursie, Anderson & Flodman. While the latter firm owned the store it became indebted to Kirkendall, Jones & Co., and $848.70 of said debt remained unpaid at the time Weber became the owner of the store. This latter amount, Weber did not assume by the purchase he made of Flodman & Bruce. On the 8th day of October, 1888, Kirkendall, Jones & Co. induced Weber to come to their place of business, and on reaching there he was taken to a room, not their office, on the fifth floor of their business house, where were one of the firm of Kirkendall, Jones & Co. and their attorney, and Mr. Thursie and his attorney. At this time and place Kirkendall, Jones & Co. and their attorney falsely claimed to Weber that he was liable to them for the $848.70, the debt owing them by the old firm of Thursie, Anderson & Flodman, and demanded that he pay the same, which Weber then did by assigning to them a certificate of deposit of an Omaha bank, which certificate was then owned by him. Weber then brought this suit against Kirkendall, Jones & Co. to recover the money represented by said certificate of deposit, alleging that he had surrendered it involuntarily to Kirkendall, Jones & Co. while unlawfully

restrained of his liberty by them, and in fear of threats made by them if he did not pay Thursie, Anderson & Flodman's debt, that they Kirkendall, Jones & Co. would seize, by attachment, his shoe store. The case was tried to the court, a jury being waived. The court made certain special findings and found generally for Kirkendall, Jones & Co., and Weber brings the case here on error.

"The special findings made by the court, material here, are as follows: That Kirkendall, Jones & Co. made no direct threat to attach Weber's store, but by their acts and expressions they led him to believe that they would attach his stock of goods if he did not pay the $848.70 claimed; that Weber would not have paid this claim had he not believed from the acts and statements made by Kirkendall, Jones & Co. that they intended to attach his shoe store if he did not pay it; that the money paid by Weber was not for a debt he owed Kirkendall, Jones & Co., but was the debt of another. These special findings of the district court, and the evidence in the record, establish this: That Kirkendall, Jones & Co. knew that Weber was not legally liable for the claim which they induced him to pay, and that Weber made this payment because he feared that if he did not make it that Kirkendall, Jones & Co. would attach his shoe store and ruin his business, and that this fear was fixed in Weber's mind by the acts and statements of Kirkendall, Jones & Co. and their attorney, at the conference above referred to. The precise question then is, was this payment made by Weber voluntarily? In this case the honesty of Weber's claim is not denied. It is defended against here by the defendants in error on technical grounds throughout; the principal ground of defense being that the payment was voluntarily made. It is undoubtedly a general rule that money paid voluntarily, without fraud and with a full knowledge of all the facts, cannot be recovered back by the party who has so paid it. There are, however, many exceptions to this rule, or rather instances in which the payments, having been made under a pressure of an enforced emergency, are not considered voluntary but compulsory in law.

"*　.　*　.　*　*　*　*　*

"These authorities establish the rule that an illegal payment made by one in order to obtain his property from another who has possession of it, and refuses to surrender it unless such payment is made, is not a voluntary payment and may be recovered back. Counsel for defendants in error admit the correctness of this rule, but say, however, that it is not applicable to the facts in the case at bar, since defendants in error did not, at the time they compelled Weber to

make the payment to them of the debt owing them by Thursie, Anderson & Flodman, have possession of Weber's store; but we cannot appreciate this distinction. What is the difference in principle whether defendants in error unjustly compeled the plaintiff in error to pay a debt which he did not owe them by fixing and inducing in his mind the reasonable fear that if he did not pay it they would attach his store, and going in the first instance and attaching his goods and then refusing to release them unless he would make the payment demanded? Either method of obtaining this money was equally unlawful. It must be borne in mind that this record shows that this claim made by defendants in error on the plaintiff in error was illegal and unjust, and unfounded, and defendants in error knew that. . . . *Counsel for defendants in error say that no precedent can be found allowing money to be recovered back which has been paid because the party paying it feared that if he did not, the party who demanded the payment would seize his property by legal process. I have no doubt that when the first case arose to recover money back which had been extorted from the owner by one in possession of his property, in order to induce such extortioner to release possession of the property, that counsel who defended in the case made the argument that no precedent could be found allowing such payment to be recovered back, and that it was a voluntary payment, and that in order to entitle such party to recover, he must show that he made the payment by reason of fear of loss of life or irreparable injury to his person. But it seems that the court was equal to the emergency and made a precedent, and from this time forth a precedent will be found in the case of Weber v. Kirkendall, 39 Neb., 193, allowing money to be recovered back which a party has paid by reason of fears that if he did not pay it the party who made the demand would attach his goods.*''

In *Sylvan Mortgage Co.* v. *Stadler*, 113 Misc. Rep. 659, the court said at pages 667 and 668:

''Of course, no state of facts like the present one due to the acute housing shortage can be shown to which the principle of duress has been made applicable. But a novel situation has never been the ground for denying warranted relief. Each case must be judged on its merits. Very appropriate language is used in *Barnett Oil & Gas Co.* v. *New Martinsville Oil Co.*, 254 Fed. Rep. 481, where after discussing the more liberal views held by the American courts on the applicability of the defense of duress the court says at pages

486 and 487: 'The result to my mind leads to the very familiar conclusion that such application must, in the final analysis, depend upon the facts of each case, and that the chancellor or the judge must be controlled by a sound discretion in each; that no hard and fast rule can be established; the effort must be to see the right and justice in the case and do it.'

"It is maintained, however, that a threat to do a lawful act cannot constitute duress, and that the plaintiff was justified in threatening dispossess proceedings unless the lease was signed. This is undoutedly the general rule. *Dunham* v. *Griswold*, 100 N. Y. 224; *Lilienthal* v. *Bechtel Brewing Co.*, 118 App. Div. 205; *McGuire & Co.* v. *Vogel Co.*, 164 id. 173. But that rule implies that threats of legal proceedings are made for the purpose of obtaining what the party making the threats is entitled to. Means in themselves lawful may be so oppressively used as to amount to an abuse of legal remedies, although what amounts to such an abuse is not susceptible of exact definition. 3 Williston Cont. section 1607. And as stated in 1 Page on Contracts (Sec. 490) a threat to institute civil litigation may amount to duress under circumstances of special hardship. In this case the vice of the transaction does not consist in the procuring of the lease nor even in the threat of dispossess proceedings, but in the fact that the plaintiff took advantage of the helpless situation of the defendant to exact an oppressive rent. If the defendant, even impelled by fear of being ousted on October first, had signed a lease containing a fifty per cent increase of rent or any other sum that was reasonable, the defense of duress would not be available. What was said in the Kilpatrick case, *supra*, applies *mutatis mutandis* to this case. The plaintiff held the defendant's property in its grasp to the extent of the increase in rent beyond what was reasonable and would not consent to a renewal of the lease unless an unlawful exaction was complied with."

The judgment in this case was reversed in *Sylvan Mortgage Co.* v. *Stadler*, 115 Misc. Rep. 311, not because of any error of the lower court in its statement of the law but because the facts did not bring the case within the equitable doctrine recognized by both courts. It is true that the opinion of the appellate court contains an unguarded statement to the effect that: "Duress can never be predicated upon a threat to enforce legal rights by lawful means." This statement, however, should be construed in connection with the context and

the opinion as a whole clearly shows, we think, that it was not intended to be as broad and unqualified as it would seem to be if torn from its setting and considered along. In any event, it is entirely too sweeping in its terms, and, if it is to be literally construed we cannot subscribe to it.

For present purposes it will suffice to quote pertinent paragraphs from the headnotes of three other cases: *Rose* v. *Owen*, 85 N.E. 129; *Shelton* v. *Trigg*, 226 S.W. 761; and *Bither* v. *Packard*, 98 Atl. 929.

### *Rose* v. *Owen*:

"Where threats, either actually or reasonably, may coerce the will of the party threatened, a contract induced thereby, and resulting from such coercion, is invalid for duress."

### *Shelton* v. *Trigg*:

"Where a partnership contract gave defendant partner an absolute right to dispose of the partnership property and to dissolve the firm at his option, and also gave him absolute control over the other partners, but provided that no partner should receive compensation for work performed for the firm, defendant's actions in threatening to dispose of the partnership property and to dissolve the firm if he were not paid a salary for doing the work of the other partners whom he had discharged *held* to constitute duress, and to make him liable for an accounting for salaries so paid; defendant's threat to exercise a contractual right to accomplish an ilegal purpose rendering the threat illegal.

"Where defendant partner had by duress exacted a salary from the partnership for his services, contrary to the terms of the contract, by threatening to exercise his contractual right of disposing of the partnership property and of dissolving the firm, he was not entitled in equity and good conscience to retain the salary paid, within the rule that to recover moneys paid under duress it must be shown also that it was against equity and good conscience for the payee to retain it.

"The test as to what constitutes 'duress' is not so much the nature of the threat or the words used but the effect of the threat on the mind of the servient party, it being the duty of the court to take into consideration the standard of the individual affected

and all the surrounding circumstances, and when it appears that agreement was under restraint, that the parties were not dealing at arm's length, but that its execution was the result of the choice between two evils, a court of equity will refuse to enforce the contract and decree recovery of money if paid thereunder."

## *Bither* v. *Packard:*

"Plaintiff obtained a loan from defendant to complete the purchase of a house, and gave his note therefor, and, after acquiring a drug business, gave the defendant his demand notes for an additional loan secured by a second mortgage on his home, and a mortgage upon the stock of goods, providing for his possession until the mortgagee should take possession after default of payment. On defendant's threat to foreclose, plaintiff signed an agreement to pay defendant as long as engaged in the drug business a monthly sum which with interest on the amounts borrowed amounted to 40 per cent. *Held,* that the transactions were so unconscionable and wanting in consideration as to entitle the plaintiff to recover money paid to the defendant thereon.

"Where one person has in his possession money which in equity and good conscience belongs to another, the law will create an implied promise on his part to pay it to the one to whom it belongs, and in such case an action for money had and received may be maintained.

"An action for money had and received is comprehensive in scope, and though in form a proceeding at law, is equitable in purpose, and the substantial justice which it promotes renders it favored by the courts.

"An action for money had and received lies for money paid under protest or obtained by any fraud, duress, extortion, imposition, or other taking of undue advantage of the plaintiff's situation, or otherwise involuntarily or wrongfully paid.

"Where a defendant is proved to have in his hands the money of the plaintiff which, *ex aequo et bono*, he ought to refund, the law conclusively presumes that he has promised to do so, and the jury are bound to find accordingly, and, after verdict, the promise is presumed to have been actually proved."

No case has been called to our attention in which any court has held that in circumstances similar to the facts now before us, a threat to attach the property of a debtor and the property of his sureties does not amount to duress.

If García, in order to avoid the foreclosure of a mortgage, had conveyed the mortgaged property to the mortgagee and the mortgagee had agreed to reconvey within a certain time upon payment of an amount slightly in excess of the principal secured by the mortgage and, if García had paid the said amount without protest as the consideration for a reconveyance, he would have had no reason to complain of duress, *Burke* v. *Gould, supra.* If in circumstances similar to those outlined in *Rivera* v. *Manufacturers Life Ins. Co., supra*, García had surrendered for cancellation a life insurance policy and if after consulting his attorney, García had cashed a check received by him as consideration for the surrender, he could not on the ground of duress avoid the result of such surrender and cancellation. The bank might have demanded further security and might have told García that if he did not furnish such additional security it would proceed to attach his property and the property of his sureties. Such a threat would not have amounted to intimidation and if García had furnished additional security in order to avoid the impending action, he could not have successfully pleaded duress. *Rodríguez* v. *M. Joglar & Co.*, 46 P.R.R. 338. The bank, of course, might have informed García that if he did not pay the whole or any specified part of his debt or that if he did not authorize the bank to apply the $750 in its possession as a partial payment of such debt the bank would take immediate action; no one would contend that if García had consented to such a disposition of his property the agreement would have been vitiated by duress. It may be conceded for the purposes of this opinion that the bank might have demanded and received as the price of its forbearance any amount that would not fall within the statutory definition of usury. Perhaps for the sake of argument only something more than this might be conceded, but we need not pursue the inquiry further. We hold no brief for appellant on this point.

■ The rule that a creditor's threat to pursue his legal remedy is not intimidation was never intended to defeat the ends of justice. It is not an inflexible rule. It is a rule that should be intelligently applied when applicable. It is not a rule to be blindly followed when in the peculiar circumstances of any particular case the result would be inequitable, unfair to the debtor or unjust. The chancellor or judge should be and is we think free to exercise a sound discretion in his effort "to see the right and justice of the case and do it." *Barnett Oil & Gas Co.* v. *New Martinsville Oil Co.,* 254 Fed. 481, 487.

The threat to attach García's property and the property of his sureties cannot be segregated from the whole of which it is an integral part and regarded as the only fact before us. The situation designed and created by the bank before making its threat is an equally outstanding part of the same indivisible whole. The bank, improving the opportunity afforded by its possession of García's property in a fiduciary capacity, appropriated that property to its own use. Thus the bank deprived García of the means with which to resist any action that might be brought by the bank, to say nothing of the means with which to pay his debt to the bank or of the means with which to seek redress for the wrongful conversion of his property. In other words the bank first tied the hands of its debtor and then applied the pressure of the threat to attach his property and that of his sureties. Only by reason of the unconscionable advantage so obtained was the bank enabled to extort from García his involuntary *nunc pro tunc* submission to the treatment already received by him at the hands of the bank. These are the circumstances in which we are now asked to say that the threat of attachment was not intimidation. This we are unable to do.

The judgment appealed from will be affirmed.

Mr. Justice Wolf dissented.