1998 ME 97

**GORHAM SAVINGS BANK**

v.

**Susan MacDONALD et al.**

Supreme Judicial Court of Maine.

Argued Dec. 3, 1997.

Decided May 4, 1998.

Peter DeTroy (orally), Russell B. Pierce, Jr., Portland, for plaintiff.

John S. Campbell (orally), Portland, for defendants.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, and DANA, JJ.

DANA, Justice.

[¶ 1] Susan MacDonald, the personal representative of the estate of Fred S. Plummer and co-trustee under the will of Etta Plummer, appeals from a judgment entered in the Superior Court (Cumberland County, *Brennan, J.*) after a jury verdict finding the estate liable for a $520,000 personal guaranty executed by Fred Plummer. She contends that the court erred in instructing the jury

regarding estoppel and in granting a summary judgment on her defense of unconscionability and her counterclaims of violation of the Improvident Transfers Act and conversion. Gorham Savings Bank cross-appeals the jury's verdict that found the existence and breach of a fiduciary relationship between the Bank and Fred Plummer. Finding no error in the court's instructions or grant of a summary judgment, we affirm.

## I.

[¶ 2] This case arises out of the attempted enforcement of a personal guaranty given to Gorham Savings Bank by Fred Plummer before his death in 1993. Fred founded and served as president of F.S. Plummer, Co., Inc., a developer of residential subdivisions, from 1957 until 1973 when, upon his retirement, his son Mark Plummer assumed the presidency of the company. Fred continued to assist the business after his retirement. During Fred's tenure as president of F.S. Plummer Co., the business established close professional relationships with Gorham Savings Bank and the law firm of Perkins, Thompson, Hinckley & Keddy, and Fred developed personal friendships with Allison Edwards, Gorham Savings Bank's president and chief executive officer, and Roy Keddy, a partner at Perkins, Thompson, Hinckley & Keddy. Keddy also served as chairman of the Bank's board of trustees and provided legal advice to the Bank over many years.

[¶ 3] Because of the very nature of its business, F.S. Plummer Co. needed to borrow substantial sums of money from lending institutions to cover the cost of building homes. It secured its debts with the properties under development and paid off the loans with the revenue generated by their sale. By the fall of 1991, F.S. Plummer Co. owed approximately $2.2 million to Gorham Savings Bank and maintained banking relationships with several other banks, including Maine Savings Bank. Gorham Savings Bank also held notes reflecting five personal loans to Fred in the approximate amount of $130,-000. The personal loans were fully secured by nine certificates of deposit owned by Fred and held by the Bank. When Maine Savings Bank collapsed during the difficult financial period of the late 1980s and early 1990s, F.S. Plummer Co.'s loans with that bank were taken over by Fleet Bank and its subsidiary Recoll Management Corporation. Recoll expressed a willingness to sell the loans at a substantial discount, and in the fall of 1991, Mark Plummer presented Gorham Savings Bank with a proposal for the Bank to finance the Recoll buy-out. The Bank initially rejected the proposal because it would have caused the Bank to exceed its legal lending limit to one customer. Over the ensuing months, Mark and his attorneys at Perkins, Thompson, Hinckley & Keddy had ongoing discussions with Bank officials regarding proposals for facilitating the Bank's involvement in the Recoll buy-out. At some point during this period of negotiation, the Bank, acting on the advice of an attorney at Perkins, Thompson, Hinckley & Keddy, retained counsel from the law firm of Drummond & Drummond because of the conflict created by Perkins, Thompson, Hinckley & Keddy's representation of both the Bank and F.S. Plummer Co. By June of 1992, Mark had negotiated with Recoll to lower the overall cost of the buy-out and had put together a business proposal that was sufficiently acceptable for the Bank.

[¶ 4] One aspect of the proposal was designed to provide a portion of the loan proceeds to F.S. Plummer Co. without the company becoming primarily liable for repayment, thereby avoiding the lending limit. To that end, upon Mark Plummer's direction, attorneys at Perkins, Thompson, Hinckley & Keddy formed a new entity, Samuels Corp., making Fred the corporation's sole shareholder and naming Mark as its vice president. Mark discussed this arrangement with his father and assisted Fred in completing the incorporation documents. Gorham Savings Bank agreed to loan Samuels Corp. $520,000, which Samuels Corp. in turn would use to purchase F.S. Plummer Co.'s business property in Gorham with the understanding that F.S. Plummer Co. would be allowed to lease the property from the new company. F.S. Plummer Co.'s lease payments would be used by Samuels Corp. to make payments on the note given in exchange for the $520,000.

[¶ 5] On July 8, 1992, Samuels Corp. executed both a promissory note in the amount of $520,000 and a mortgage deed on the business property in favor of the Bank. Both instruments were executed by Mark Plummer in his capacity as vice president of Samuels Corp. In addition to the note and mortgage, the Bank insisted that Fred, as sole shareholder of Samuels Corp., execute an unlimited personal guaranty of the loan. On July 14 several documents relating to the loan transaction remained to be signed including the personal guaranty. The Bank's attorneys had drafted these documents and were instructed by Mark's attorneys at Perkins, Thompson, Hinckley & Keddy that Mark would pick up the documents at the Bank and take responsibility for getting the proper signatures. An F.S. Plummer employee, John Peverada, brought the documents to Fred, who was at that time in Mercy Hospital with complications from his persistent medical problems. John notarized Fred's signature on several of the documents, including the guaranty, before returning the documents to a Drummond & Drummond employee who was waiting for the documents at the Bank.

[¶ 6] It is undisputed that throughout the negotiation and closing of this complicated loan transaction, nobody at the Bank had any direct contact with Fred Plummer. All of Fred's involvement in these transactions was conducted either through Mark Plummer, John Peverada, or through attorneys at the law firm of Perkins, Thompson, Hinckley & Keddy.[1]

[¶ 7] Samuels Corp., whose obligations on the note for $520,000 were being paid by F.S. Plummer's lease payments after the transfer of property, defaulted on the note in 1993, and the Bank brought this action against the estate of Fred Plummer for enforcement of the guaranty.[2] The estate's answer to the complaint interposed twenty-four affirmative defenses and raised a number of counterclaims, including claims for breach of fiduciary duty and conversion on the part of the Bank. The Bank filed a motion for summary judgment on its claim to enforce the guaranty and on the estate's defenses and counterclaims. The court granted the Bank's motion in large part, but allowed the following claims and defenses to proceed to trial: (1) the Bank's guaranty claim; (2) the estate's defenses of failure to disclose risk, incapacity, misrepresentation, and fraudulent inducement; and (3) the estate's counterclaims of breach of fiduciary duty and conversion. After a five-day trial, the jury returned a verdict in favor of the Bank. The jury, in answering four special verdict forms, found that Fred Plummer had the capacity to sign the personal guaranty; the Bank had a fiduciary relationship with Fred that it breached; despite the breach of fiduciary duty, the estate was estopped to assert the fiduciary relationship or breach; the estate did not prove that the Bank committed conversion; and finally, the estate failed to prove that punitive damages should be awarded in the case. The court entered judgment on the verdict in favor of the Bank and subsequently denied the estate's motions for a judgment notwithstanding the verdict and for a new trial. This appeal followed.[3]

---

1. Unbeknownst to the Bank and the Bank's attorneys, on July 7, 1992, just prior to the closing of these complex loan transactions, an attorney at Perkins, Thompson, Hinckley & Keddy gave Mark Plummer a letter to be hand-delivered to Fred with eleven documents that required either Mark or Fred's signature. These documents related to the incorporation of Samuels Corp. and the lease between F.S. Plummer and Samuels Corp. on the Gorham business property. At the conclusion of that letter, Fred was informed that although the law firm of Perkins, Thompson, Hinckley & Keddy had represented him in other matters, with regard to this matter the firm was acting only on behalf of F.S. Plummer Co. and advised him that he might wish to contact separate counsel. Mark Plummer reviewed this letter, but did not discuss its details with his father.

2. The Bank brought a separate action for foreclosure on the business property in Gorham. A judgment of foreclosure was entered against Samuels Corp. on February 7, 1994. *Gorham Sav. Bank v. Samuels Corp.*, CV–93–1083 (Me.Super.Ct., Cum.Cty., Feb. 7, 1994) (Lipez, J.).

3. This appeal involves only those claims between Gorham Savings Bank and Susan MacDonald as personal representative of the estate of Fred Plummer, Susan MacDonald as co-trustee under the will of Etta Plummer, and Samuels Corp. There are claims pending in the Superior Court between the Bank and Mark Plummer and F.S. Plummer Co.

## II.

[¶ 8] The estate initially contends that the trial court erred by allowing the jury to consider whether the estate could be estopped from receiving the benefit of its breach of fiduciary duty defense, arguing that estoppel was not supported by the evidence and the court erroneously instructed the jury as to its elements. The court instructed the jury that the estate could be estopped from relying on its breach of fiduciary duty defense if it found "that any representative of Fred Plummer, including ... Mark Plummer or attorneys from Perkins, Thompson, made statements or engaged in conduct which led the bank to reasonably believe that the interests of Fred Plummer were being protected by them...."

[¶ 9] The estate asserts that *Casco Northern Bank, N.A. v. Pearl*, 584 A.2d 643 (Me. 1990), controls the estoppel issue in this case. In *Pearl*, the debtors, who were also beneficiaries of a trust administered by Casco Northern Bank, were estopped from challenging the propriety of a transaction with the fiduciary bank. We instructed in *Pearl* that "a beneficiary will be estopped from challenging the propriety of the transaction when the beneficiary is competent, acts with full knowledge of the material facts and of the effect on his rights, is not induced by the trustee's misrepresentations or coercion, and voluntarily consents to the transaction." *Id.* at 645. The estate maintains that the Bank was not required to prove any of these elements with regard to the guaranty signed by Fred Plummer and argues that it was error to allow the Bank's breach of a fiduciary duty to be excused by the breach of other fiduciaries. The estate's focus on the Bank's relationship with Fred, however, fails to directly address the essential point at issue here, namely, whether the estate can be estopped because of the conduct of Fred's agents or persons with apparent authority. In *Pearl*, we simply were not faced with a need to determine how the existence of an intervening agency relationship might affect the rela-

tionship between a fiduciary and a beneficiary.

[¶ 10] In *Berman v. Griggs*, 145 Me. 258, 75 A.2d 365 (1950), we held that the statements of an attorney to his clients' creditors that the clients had agreed to convey a building to a corporation as an additional asset estopped the clients from later asserting the contrary position against the assignees of the creditors, thereby recognizing the proposition that principals can be estopped by the conduct of their agent. *Id.* at 264–65, 75 A.2d at 368.

 [¶ 11] In the case before us there was sufficient undisputed evidence that the Bank reasonably could have believed that Fred's interests were being protected by his agents. Mark Plummer had a durable power of attorney to represent his father's interests and had in fact borrowed money from the Bank on a regular basis in his father's name and against his father's certificates of deposit. The Bank also had no reason to know that Perkins, Thompson, Hinckley & Keddy's longstanding representation of Fred was being suspended for this one transaction. In fact, each of the Plummer children who testified at the trial was under the assumption that Perkins, Thompson, Hinckley & Keddy was continuing its representation of Fred individually as well as representing the business entities. The estate has offered us no authority for its contention that the Bank's fiduciary duty to Fred necessitated an inquiry into whether Fred's interests were being protected by independent counsel, especially in these circumstances where the Bank was dealing directly with Mark Plummer and the law firm of Perkins, Thompson, Hinckley & Keddy who had both actual and apparent authority to act on behalf of Fred and had done so many times in the past. We find no error in the court's instruction that permitted the jury to consider the conduct of Fred's agents when determining whether his estate could be estopped from benefiting from a defense of breach of a fiduciary duty.[4]

4. Because of our disposition of the estoppel issue, we need not address the Bank's cross-appeal regarding the court's instruction and the jury's finding of a breach of a fiduciary duty on the part of the Bank.

## III.

[¶ 12] The estate also asserted Fred's incapacity at the time of signing the guaranty as a defense to enforcement of the promise. The jury rejected this defense and found that Fred was competent when he executed the guaranty. On appeal, the estate claims the jury was improperly instructed and argues that "the trial court instructed that the jury could find that capacity existed even if Fred Plummer was incompetent if the Bank were led to believe there was no issue regarding Fred Plummer's capacity." This is an inaccurate characterization of the jury instruction. The court's actual instruction to the jury was as follows:

> [I]f you should find in this case that any representatives of Fred Plummer, which could include any person acting as his agent, and whether—who his agents are is for you to determine, could include Mark Plummer or representative of Perkins, Thompson law firm—made statements or engaged in conduct which led the bank to reasonably believe that there was no issue regarding the capacity of Fred Plummer to enter into this transaction, then you may find in favor of the bank, regardless of whether Mr. Fred Plummer was incompetent or incapacitated.

Although this instruction permitted the estate to be estopped from taking advantage of the incapacity defense, the jury's finding that Fred was in fact competent rendered the court's estoppel instruction moot. The jury was instructed to make a separate finding of Fred Plummer's capacity before even considering whether the estate should be estopped from asserting lack of capacity as a defense.[5] Based on those instructions, the jury found as a matter of fact that Fred Plummer had capacity to contract when he signed the guaranty. Contrary to the estate's contentions, this finding is supported by credible evidence in the record.

## IV.

[¶ 13] The estate next contends that the court should have entered a judgment as a matter of law finding the Bank liable to the estate on its counterclaims of breach of a fiduciary duty and conversion. Our conclusion that the estate could be estopped from relying on a breach of duty defense applies equally to the estate's counterclaim for damages caused by the Bank's alleged breach. Therefore, the court properly denied judgment on the estate's breach of fiduciary duty claim.

[¶ 14] The estate's conversion claim arises from the Bank's application of Fred's certificates of deposit toward the defaulted loan pursuant to Fred's guaranty. The estate argues that the Bank did not have the right to offset the funds at the time it did if it did not have a valid guaranty. Because we conclude that the Bank did have a valid guaranty executed by Fred, judgment on the estate's conversion counterclaim was properly denied.

## V.

[¶ 15] Finally, the estate challenges the trial court's granting of a summary judgment on its defense of unconscionability and its counterclaims for the violation of the Improvident Transfers of Title Act and for the conversion of Etta Plummer's certificates of deposit. We review the entry of a summary judgment for errors of law, viewing the evidence in a light most favorable to the party against whom the judgment was entered. *Kandlis v. Huotari,* 678 A.2d 41, 42 (Me. 1996). A party is entitled to a summary judgment "only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue of material fact." *Maine State Academy of Hair Design, Inc. v. Commercial Union Ins. Co.,* 1997 ME 188, ¶ 5, 699 A.2d 1153, 1156; M.R.Civ.P. 56(c).

[¶ 16] Contrary to the estate's contentions, the record, when viewed in the light most favorable to the estate, does not raise a genuine issue of material fact with respect to the elements of unconscionability. *See, e.g., A.L. Brown Constr. Co. v. McGuire,* 495 A.2d

---

5. The court instructed the jury at length regarding the concept of the capacity to contract and the estate does not challenge that portion of the jury charge on appeal.

794, 797 (Me.1985) (contract of adhesion); *Ouellette v. Maine Bonding & Casualty Co.,* 495 A.2d 1232, 1235 (Me.1985) (terms of contract dictated by superior party); *Dairy Farm Leasing Co. v. Hartley,* 395 A.2d 1135, 1139 n. 3 (Me.1978) ("take it or leave it" contract where parties are in vastly unequal bargaining positions); *Bither v. Packard,* 115 Me. 306, 314, 98 A. 929, 933 (1916) (fraud in negotiation or performance of contract).

[¶ 17] The estate also failed to raise a genuine issue of material fact regarding its claim pursuant to Maine's Improvident Transfers of Title Act, 33 M.R.S.A. §§ 1021–1025 (Pamph.1997).[6] Assuming, without deciding, that a cause of action pursuant to the Act survives the death of an elderly person entitled to the statute's protection, *see Estate of Campbell,* 651 A.2d 382, 383–84 (Me.1994), the estate has made no showing that a transfer of real estate, personal property, or money was involved in the execution of Fred's guaranty, nor has it challenged the summary judgment granted on its defense of lack of consideration. Because both of these elements are essential to maintain an action pursuant to the Act, the court properly granted a summary judgment in the Bank's favor on this count.

[¶ 18] MacDonald has also appealed the court's grant of a summary judgment on her claim that the Bank converted funds from her mother's estate. This claim arose out of the Bank's refusal to release funds of the estate of Etta Plummer. Mark Plummer, as personal representative of Etta's estate, had pledged the funds to obtain personal loans from the Bank, which he later defaulted on. Because we agree with the trial court that MacDonald failed to adequately brief this issue at the summary judgment stage of these proceedings, we decline to address the merits of her contentions on appeal.

6. The pertinent section of the Act provides:
 In any transfer of real estate or major transfer of personal property or money for less than full consideration by an elderly person who is dependent on others to a person with whom the elderly dependent person has a confidential or fiduciary relationship, it shall be presumed that the transfer was the result of undue influence, unless the elderly dependent person was

The entry is:

Judgment affirmed.

represented in the transfer by independent counsel. When the elderly dependent person successfully raises the presumption of undue influence by a preponderance of the evidence and when the transferee fails to rebut the presumption, the elderly dependent person shall be entitled to avoid the transfer. . . .
33 M.R.S.A. § 1022(1) (Pamph.1997).