STATE OF MAINE
Cumberland, ss.

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No: BCD- RE - 10 - 8

DAVID BORDETSKY,

      Plaintiff/
      Counterclaim Defendant

v.

MARLENE CHARRON,

      Defendant/
      Counterclaim Plaintiff,

and

PALISADES COLLECTIONS, LLC and
PINNACLE CREDIT SERVICES, LLC,

      Parties-in-Interest

DECISION AND ORDER

MARLENE CHARRON

      Third-party Plaintiff

v.

PNF REALTY, INC., LAWRENCE
P. MCMANUS, JR., GREGORY
KOUTRELAKOS, JANE M. DUGAS,
WALTER W. CHENEY, Trustee of the
FLOROS REALTY TRUST, and THOMAS
J. MCSHERA, Trustee of the KATHLEEN
M. MCSHERA 1994 TRUST,

      Third-party Defendants

David Bordetsky initiated this foreclosure action against Marlene Charron in York

District Court in May of 2009. Charron filed a counterclaim against Bordetsky and an identical

third-party complaint against his investors[1] for statutory violations of: 1) the Home Ownership and Equity Protection Act of 1994 (HOEPA), Pub. L. No. 103-325, 108 Stat. 2190 (1994), codified and incorporated into the Truth in Lending Act (TILA), 15 U.S.C.S. §§ 1601-1667f (LexisNexis 2005);[2] 2) the Maine Consumer Credit Code (the "Code"), 9-A M.R.S. §§ 8-101 to -403 (2006);[3] Before trial, the parties stipulated that, subject only to Charron's counterclaims and affirmative defenses, Bordetsky had met the requirements for his foreclosure action. Thus, the only issues at the one-day trial conducted in February of 2011 related to Charron's aforementioned counterclaims and affirmative defenses: unclean hands, unconscionability, illegality, commercial impracticability, and accord and satisfaction. In lieu of closing arguments, the parties submitted proposed judgments and the court held post-trial oral argument on May 13, 2011.

## STIPULATIONS OF FACT AND PROCEDURE[4]

Cecile J. Charron, Charron's mother, died in 1994; Charron was the personal representative of her mother's estate ("the Estate"). (Stip. ¶ 10.) At the time of her death, Cecile Charron owned encumbered property at 456 Atlantic Avenue in Wells (the "Wells property"); Charron and her brother David Charron were to inherit the property. (Stip. ¶¶ 10-11.) The

---

[1] Bordetsky funded the two mortgage loans in question by borrowing funds from Third-Party Defendants Lawrence P. McManus, Jr., Gregory Koutrelakos, Jane M. Dugas, Walter W. Cheney, Trustee of the Floros Realty Trust, and Susan M. McShera, Trustee of the Kathleen M. McShera 1994 Trust, and PNF Realty, Inc. (Stip. ¶¶ 29, 31.) Palisades Collections, LLC and Pinnacle Credit Services, LLC are named parties in interest. (Stip. ¶¶ 8-9.) Although Charron identifies the loan funders as counterclaim defendants, the court treats them as third-party defendants in this action.

[2] TILA and HOEPA have been substantially amended since the time period relevant to this case. All references in the court's judgment are to the version of the statute in effect at the time of the consummation of each loan.

[3] Similar to the federal statutes at issue, the Consumer Credit Code also has been amended substantially. All references in the court's judgment are to the version of the statute in effect at the time of the consummation of each loan.

[4] The following facts are from the stipulated record filed by the parties before trial. Any additional findings by the court are incorporated into the discussion of each counterclaim and affirmative defense.

2

Estate defaulted on the mortgage in 2005 and the mortgagee sought foreclosure against Charron, David Charron, and the Estate. (Stip. ¶ 10.)

In order to avoid the foreclosure, Charron and David Charron were put into contact with Bordetsky to pay off the loan on the property. (Stip. ¶ 11.) Charron and David Charron closed on the loan, known as the "Prior Bordetsky Loan," on February 3, 2006. (Stip. Exhs. A, B.) In connection with the loan, the Charrons received a deed to the Wells property that conveyed the property to them from the Estate. (Stip. ¶ 16.) The Prior Bordetsky Loan was a 5-year loan with a principal amount of $130,000 at the rate of 16.5% per year, interest-only monthly payments of $1787.50, and a balloon payment of all outstanding amounts due at the end of the term. (Stip. ¶ 13.) In addition, $26,812.50 of the principal amount of the loan was placed in an escrow account, and the money was to be used to make the first 15 monthly payments of the Prior Bordetsky Loan. (Stip. ¶ 14.) The escrow account was not a condition of the loan, and Charron and her brother had the right to withdraw funds from the escrow account, which they did in the amount of $16,200 between February 21, 2006 and April 18, 2006. (Stip. ¶ 14.)

Because the Charrons withdrew payments from the escrow account, there were insufficient funds to make the monthly interest payments. (Stip. ¶ 18.) Bordetsky "offered to advance the Charrons additional sums so that they could continue to make interest only payments to him while they attempted to sell the [Wells p]roperty." (Stip. ¶ 18.) The Charrons agreed and closed on the loan, known as the "First Mortgage Loan," on May 9, 2006. (Stip. ¶ 19.) The First Mortgage Loan, secured by the First Mortgage Note, was a 5-year loan with a principal amount of $180,000 at the rate of 16.5% per year, interest-only monthly payments of $2475, and a balloon payment of all outstanding amounts due at the end of the term. (Stip. ¶ 21.) This time, $37,125 of the principal amount of the loan was placed in an escrow account to make the first 15

3

monthly payments. (Stip. ¶ 18.) In addition, $7500 was paid to Bordetsky from the principal as an origination fee. (Stip. ¶ 22.) The creation of the escrow account was a condition of the First Mortgage Loan, and the Charrons did not have the right to withdraw any funds from the account. (Stip. ¶ 18.) While money remained in the First Mortgage Loan Escrow, as each monthly payment came due under the terms of the First Mortgage Loan, it was taken out of the escrow account and paid over to Bordetsky by his counsel. (Stip. ¶ 18.)

In order to fund the First Mortgage Loan, Bordetsky borrowed funds from the Floros Realty Trust, Kathleen M. Mcshera as Trustee of the Kathleen M. McShera 1994 Trust, Jane M. Dugas, Lawrence P. McManus, Jr., and Gregory Koutrelakos. (Stip. ¶ 29.) In exchange, Bordetsky issued a promissory note to each of the above persons or entities and assigned a security interest in a pro rata portion of the First Mortgage Note and First Mortgage Loan.[5] (Stip. ¶ 30.)

In July of 2007, the Charrons were past due on amounts owed to the Town of Wells for property taxes, and Bordetsky again offered to advance the Charrons additional money while they attempted to sell the Wells property. (Stip. ¶ 23.) The new loan, known as the "Second Mortgage Loan," closed on July 30, 2007. (Stip. ¶ 24.) The Second Mortgage Loan, secured by the Second Mortgage Note, was a 5-year loan with a principal amount of $50,000 at the rate of 13.4% per year, interest only monthly payments of $558.33, and a balloon payment of all outstanding amounts due at the end of the term. (Stip. ¶ 26.) In this final loan, $36,399.96 of the principal amount was placed in an escrow account in order to make 12 monthly interest payments on both the First Mortgage Loan and the Second Mortgage Loan. (Stip. ¶ 27.) In addition, $7500 was paid to Bordetsky from the loan principal as an origination fee. (Stip. ¶ 27.)

---

[5] The court understands the parties to have stipulated that these assignments are for the purposes of collateral only, thus not implicating any questions of jurisdiction or standing. (*See* Exh. DD.)

The Charrons had the right to withdraw all amounts remaining in the Second Mortgage Loan Escrow at any time. (Stip. ¶ 23.) While money remained in the Second Mortgage Loan Escrow, as each monthly payment came due under the terms of the First Mortgage Loan and the Second Mortgage, it was taken out of the escrow account and paid over to Bordetsky by his counsel. (Stip. ¶ 23.) In order to fund the Second Mortgage Loan, Bordetsky borrowed $50,000 from PNF Realty, Inc., issued a promissory note to PNF Realty, Inc., and assigned a security interest in the Second Mortgage Note and Second Mortgage Loan to PNF Realty, Inc.[6] (Stip. ¶ 31.)

Bordetsky has not received any payment on the First Mortgage Loan or Second Mortgage Loan since August 9, 2008. (Stip. ¶¶ 32-33.) On November 6, 2008, David Charron conveyed his one-half interest in the equity of redemption in the property to Bordetsky in a deed in lieu of foreclosure. (Stip. ¶ 35.) In exchange for the deed in lieu, Bordetsky released David Charron from any personal liability on the First Mortgage Loan and Second Mortgage Loan. (Stip. ¶ 35.) Any payments made on the First Mortgage Loan and Second Mortgage Loan were paid out of the proceeds of the loans, and not from any funds otherwise belonging to the Charrons. (Stip. ¶ 46.)

Bordetsky initiated this foreclosure action by filing a complaint in York District Court on May 21, 2009, and Marlene Charron properly responded, most recently by filing an amended answer and counterclaim on February 25, 2010. (Stip. ¶ 39.) On January 26, 2010, Charron's counsel sent a letter to Bordetsky seeking, pursuant to 9-A M.R.S. § 8-208 and 15 U.S.C.S. § 1635, purporting to rescind the First Mortgage Loan and Second Mortgage Loan.[7] (Stip. ¶ 44.)

---

[6] The court understands the parties to have stipulated that this assignment is for the purposes of collateral only, thus not implicating any questions of jurisdiction or standing. (*See* Exh. EE.)

[7] The parties did not stipulate to Charron's attempt to rescind the First and Second Mortgage Loans pursuant to 15 U.S.C.S. § 1635 (LexisNexis 2005), but the letter sent by Charron's counsel does in fact assert as grounds for rescission both state and federal statutes. (Exh. JJ.)

5

Charron moved to transfer the case to the Business and Consumer Court on January 12, 2010, which motion was granted on February 24, 2010. The court conducted a one-day bench trial on this matter on February 3, 2011. The court held post-trial oral argument on May 13, 2011.

Subject to the counterclaims raised by Charron, the parties have stipulated that the order of priority of the claims of the parties who have appeared in this action is as follows:

FIRST PRIORITY: Bordetsky, by virtue of the First Mortgage Loan, for a total of $213,660 as of August 9, 2009, with additional interest accruing on the principal balance of $180,000 from that date at the rate of 16.5% per year, which is equal to $81.37 per day. Furthermore, the First Mortgage secures all costs, including, but not limited to, reasonable attorneys fees, incurred by Bordetsky in enforcing his rights under the terms of the First Mortgage Note and the First Mortgage. (Stip. ¶¶ 36, 38.)

SECOND PRIORITY: Palisades by virtue of the judgment lien arising from the recordation of the Palisades Execution in the Registry for the amount of $3408.89 as of September 16, 2009, plus interest accruing on this obligation at the rate of $0.68 per day after that date. (Stip. ¶ 38.)

THIRD PRIORITY: Bordetsky by virtue of the Second Mortgage Loan, for a total of $57,258.29 as of August 30, 2009, with additional interest accruing on the principal balance of $50,000 from that date at the rate of 13.4% per year, which is equal to $21.02 per day. Furthermore, the Second Mortgage secures all costs, including, but not limited to, reasonable attorneys fees, incurred by Bordetsky in enforcing his rights under the terms of the Second Mortgage Note and the Second Mortgage. (Stip. ¶¶ 37-38.)

FOURTH PRIORITY: One half of the surplus to Charron and one half of the surplus to Bordetsky.

6

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.   CHARRON'S AFFIRMATIVE DEFENSES

Charron pleads five affirmative defenses to Bordetsky's foreclosure action[8]:   unclean hands, unconscionability, illegality, commercial impracticability, and accord and satisfaction. Despite the identification of the defenses of unclean hands, illegality, and commercial impracticability in her Amended Answer and in the Joint Final Pretrial Statement, Charron did not pursue these three defenses at trial or in her post-trial briefing and the court concludes she has not met her burden on those defenses.[9] *See Hansen v. Sunday River Skiway Corp.*, 1999 ME 45, ¶ 11 n.2, 726 A.2d 220, 223 ("Generally the party opposing a claim, usually a defendant, has the burden of proof on an issue characterized as an affirmative defense or other issues to avoid or reduce liability.")   The court addresses unconscionability and accord and satisfaction separately.

### A.   UNCONSCIONABILITY

Charron asserts the affirmative defense of unconscionability, both in the procedure and in the substance of the First and Second Mortgage Loans.[10]   Charron avers that there was a large

---

[8]  Count III of Charron's Counterclaim is a claim for unconscionability.  Because this claim is in fact a defense, the court treats it as such.  *See* M.R. Civ. P. 8(c) ("When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation.")

[9]  It seems unlikely any of the three defenses would have changed the outcome even had they been pursued.  Any illegality defense has been addressed in this Decision and Order in the context of Charron's allegations of violations of state and federal statute and regulation.  Likewise, any conduct of Bordetsky that might have supported an unclean hands defense is addressed in the same context.  As to commercial impracticability, the facts as found do not support any such affirmative defense.  "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."  RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981).  Charron herself was unable to perform her obligations under the various agreements without selling the property, a fact that was known before the parties entered into the First and Second Mortgage Loan transactions and is neither an "act of God" nor an act of a third party.  *See Coastal Ventures v. Alsham Plaza, LLC,* 2010 ME 63, ¶ 19 n.6, 1 A.3d 416, --- (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. d)).

[10]  Charron alleged common law unconscionability, and not unconscionability under the Code, *see* 9-A M.R.S. §§ 9-402 to -403 (2006).  Because the court concludes that Charron has not met her burden on the common law

7

disparity of bargaining power between her and Bordetsky and that the terms of each loan are unconscionable. (Amend. Answer ¶¶ 92-93.) She further avers that the First and Second Mortgage Loans were induced by unconscionable conduct on the part of Bordetsky, including, but not limited to selling loans to Charron that he knew or should have known would result in foreclosure. (Amend. Answer ¶ 94.)

Pursuant to section 208 of the Restatement (Second) of Contracts,

If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.

RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981). With regards to disparity of bargaining power, which relates to procedural unconscionability, the Law Court has instructed that "[t]here may be such unconscionableness or inadequacy in a bargain as to demonstrate some gross imposition or some undue influence," but "such unconscionableness or such inadequacy should . . . shock the conscience, and amount in itself to conclusive and decisive evidence of fraud." *Bither v. Packard*, 116 Me. 306, 314, 98 A. 929, 933 (1916).

With regards to substantive unconscionability, the Law Court stated that "if upon the whole circumstances, the contract appears to be grossly against conscience, or grossly unreasonable and oppressive, courts of equity will sometimes interfere and grant relief, although they certainly are very cautious of interfering unless upon very strong circumstances." *Id.*

Based on the evidence at trial, the court makes the following findings. Charron had just lost her job at Anthem when the Estate defaulted on the mortgage on the Wells property and the bank instituted foreclosure proceedings. Charron saw an advertisement in a Falmouth newspaper for a private lender that connected her with Bordetsky, resulting in the Prior Bordetsky Loan and

defense of unconscionability, the court need not address whether common law unconscionability is available on a transaction subject to the Code.

avoiding foreclosure. The payments on the Prior Bordetsky Loan were $1787.50 per month, the first 12 of which were to be drawn from the escrow account associated with the loan. Without the funds in the escrow account, Charron testified that she would have been unable to make those $1787 monthly payments. Charron's present counsel represented her at the closing of the Prior Bordetsky Loan.

When Charron and her brother depleted the escrow account on the Prior Bordetsky Loan, Charron indeed could not make the monthly payments. Bordetsky told Charron that he would foreclose on the property if she did not enter into the second loan, refinancing the Prior Bordetsky Loan into the First Mortgage Loan. Charron described her situation at the time: "My back was up against the wall." At the time of the First Mortgage Loan, Charron estimated that the value of the Wells property was $325,000. Although she could not afford the $1787.50 monthly payments on the Prior Bordetsky Loan, Charron nevertheless thought that she would be able to find new employment and that her brother would help contribute to the household, and that somehow she would be able to afford the $2475 monthly payments required by the First Mortgage Loan. Charron did not have counsel present at the closing on the First Mortgage Loan, but Bordetsky's counsel explained the terms to her, which were substantially the same as the Prior Bordetsky Loan.

When the escrow account on the First Mortgage Loan was depleted 15 months later, Charron approached several conventional banks about a refinance of the existing loan, but was ineligible. Bordetsky offered to loan Charron and her brother an additional $50,000; Charron felt she had no other option but to agree to the new loan because without it she would have been unable to make the payments on the First Mortgage Loan. Between the First and Second Mortgage Loans, the Charrons' monthly payments were $3033.33. At the time of the Second

9

Mortgage Loan, Charron took home approximately $1500 per month, and her brother took home about $2600 per month. Charron's present counsel represented her at the closing of the Second Mortgage Loan.

The court concludes that Charron has not proved procedural unconscionability, or such a great disparity in bargaining power that it "shocks the conscience" on either loan. *See Bither*, 116 Me. at 314, 98 A.2d at 933. The terms of the First and Second Mortgage Loans were provided to Charron and her brother at the closing on each loan and there is no evidence that at any point Bordetsky deceived Charron about the terms of either loan. Although Charron testified that Bordetsky repeatedly called her about the loans and her ability to pay him back, the court does not find that the calls rise to the level of "some gross imposition or some undue influence" that would constitute procedural unconscionability. *See Bither*, 116 Me. at 314, 98 A. at 933.

The court likewise concludes that Charron has not proved substantive unconscionability on either loan. The terms of the First and Second Mortgage Loans, although onerous, are not "grossly unreasonable or oppressive." *See Bither*, 116 Me. At 314, 98 A.2d at 933. Although Charron testified that she never intended to sell the Wells property, she led Bordetsky to believe otherwise. Bordetsky reasonably believed these loans to be a bridge until Charron and her brother could sell the property. Charron testified she was surprised about some of the terms at the closing, but she was not upset by those terms and had she known about them prior to the closing she still would have proceeded with the transactions.

B.   ACCORD AND SATISFACTION

Charron alleges that the deed in lieu accepted by Bordetsky from David Charron constitutes an accord and satisfaction of her own debt.[11] "An accord is a contract under which an

---

[11] The court addresses Charron's other arguments regarding the deed in lieu elsewhere in this decision. (*See infra*, III(C), Remedies: Other Relief.)

10

obligee promises to accept a substituted performance in future satisfaction of the obligor's duty." *Union River Assocs. v. Budman*, 2004 ME 48, ¶ 19, 850 A.2d 334, 340 (quoting *Associated Builders, Inc. v. Coggins*, 1999 ME 12, ¶ 4, 722 A.2d 1278, 1280). "Satisfaction is the execution or performance of the accord. If the obligor breaches the accord, the obligee may enforce either the original duty or any duty pursuant to the accord." *Associated Builders*, 1999 ME 12, ¶ 5, 722 A.2d at 1280 (citing Restatement (Second) of Contracts § 281 (1981)). The court concludes that accord and satisfaction is inapplicable in the present circumstances. Charron made no agreement with Bordetsky for a substituted performance, and to the extent that the defense may be available to David Charron, Charron has no standing to assert that claim. *See Halfway House v. City of Portland*, 670 A.2d 1377, 1379 (Me. 1996).

## II. CHARRON'S COUNTERCLAIMS

In their briefing to the court, the parties disputed at length what substantive law applies to Counts I and II of Charron's counterclaims, which assert that the First and Second Mortgage Loans constituted HOEPA and Code violations, respectively. HOEPA was enacted in 1994 and incorporated into the consumer protections in TILA for high-rate, high-fee mortgages. *See* HOEPA, Pub. L. No. 103-325, 108 Stat. 2190 (1994). Because Maine adopted the Code and applied to the Federal Reserve Board for an exemption from TILA, "[c]redit or lease transactions subject to the [Code] and its implementing regulations are exempt from chapters 2, 4 and 5 of [TILA]." Regulation Z, 12 C.F.R. pt. 226, Supp. I at 493 (2007).[12] Chapters 2, 4, and 5 of TILA are the chapters governing credit transactions, 15 U.S.C.S. §§ 1631-49, credit billing, 15 U.S.C.S. §§ 1666-1666j, and consumer leases, 15 U.S.C.S. §§ 1667-1667f.

---

[12] Unless otherwise noted, all references to federal Regulation Z are to the 2007 publication, which, as applied to this case, does not differ in any material way from the 2006 publication.

Bordetsky has maintained throughout this litigation that because the transactions at issue are subject to the Code, and transactions subject to the code are exempt from chapter 2 of TILA, which includes the HOEPA provisions, HOEPA has no application to the First and Second Mortgage Loans. Bordetsky thus contends that Maine's exemption from TILA meant that a Maine consumer could not bring any action under the federal statute. On this point the court disagrees. Despite Maine's exemption from chapters 2, 4, and 5 of TILA, Regulation Z also states that

> (1) No exemptions granted under this section shall extend to the civil liability provisions of sections 130 and 131 of [TILA, 15 U.S.C.S. §§ 1640-41].

> (2) If an exemption has been granted, the disclosures required by the applicable State law (except any additional requirements not imposed by Federal law) shall constitute the disclosures required by [TILA].

Regulation Z, 12 C.F.R. § 226.29(b). Thus, even to the extent Maine is exempt from Chapter 2 of TILA, "a creditor can be held liable under 15 U.S.C. § 1640 for failing to comply with any *state* law requirement that is equivalent to an actionable requirement under TILA." *Belini v. Wash. Mut. Bank, FA*, 412 F.3d 17, 26 (1st Cir. 2005). "Otherwise, section 1640 would be a nullity in an exempt state, since the substantive federal requirements have been superceded by the exemption." *Id.*

The Law Court's recent decision in *Deutsche Bank National Trust Company v. Pelletier*, 2011 ME 87, -- A.3d ---, addressed the issue of the applicable substantive law as between the Code and TILA. In *Pelletier*, Deutsche Bank's predecessor refinanced the Pelletiers' existing mortgage in 2006, but failed to provide the Pelletiers with all the required TILA disclosures. *Id.* at ¶ 2, -- A.3d at ---. When Deutsche Bank did not oppose the Pelletiers' claim for rescission pursuant to 15 U.S.C.S. § 1635 in the foreclosure action, the trial court granted summary judgment on that issue in favor of the Pelletiers. *Id.* at ¶ 8, -- A.3d at ---. The Law Court

12

affirmed, but remanded for effectuation of the rescission pursuant to 15 U.S.C.S. § 1635(b). The Law Court also made clear that the Code did not apply to the mortgage transaction in that case, explaining that

> [i]n the 1980s, Maine obtained an exemption from the application of the federal TILA from the Federal Reserve Board by showing that MeTILA's [the Code's] requirements were "substantially similar" to those imposed under the federal law and that there was "adequate provision for enforcement." The federal TILA was amended in some ways after Maine obtained the exemption, however. *Maine did not amend its statutes or obtain an exemption from the federal TILA by demonstrating that it had made its statutes "substantially similar" to the amended federal TILA until 2009.* Additional amendments have been adopted this year, but these amendments are not yet in effect. Accordingly, we apply the federal TILA in this case, but we include citations to the relevant Maine statutes for reference because the rescission provisions are identical and Maine law would apply if the federal law did not.

*Pelletier*, 2011 ME 87, ¶ 9, n.4, -- A.3d at --- (emphasis added) (citations omitted). The time period relevant here is the same as in *Pelletier*, so this Decision and Order applies the federal TILA and HOEPA provisions on the basis of the *Pelletier* decision.[13]

In practical terms, however, because the Maine Office of Consumer Credit Regulation[14] adopted the 2002 version of Regulation Z, with certain exceptions, "so as to implement Article VII[, Truth-in-Lending,] of the Maine Consumer Credit Code," Office of Consumer Credit Regulation, Truth-in-Lending, Regulation Z-2, § 2 (July 28, 2002) (on file with the Maine Secretary of State) (hereinafter "Regulation Z-2"), the federal and state provisions related to high-rate, high-fee mortgages are nearly identical. Further, section 5 of Regulation Z-2 states that "this State's regulations interpreting Truth-in-Lending principles must be at least as

---

[13] Because the *Pelletier* decision was issued after briefing in this case was closed, the court will give the parties an opportunity to address the effect of *Pelletier* in the course of their memoranda regarding the form of judgment. (*See infra*, III(C).)

[14] The Maine Office of Consumer Credit Regulation is now the Maine Bureau of Consumer Credit Protection.

protective as federal Regulation Z." Regulation Z-2, § 5. The court cites to the Maine Code for reference only in its HOEPA analysis.

A.     COUNT I - HOEPA VIOLATIONS

In her first counterclaim (the "First Counterclaim"), Charron asserts that the First Mortgage Loan and the Second Mortgage Loan violated HOEPA, 15 U.S.C.S. § 1639, by:

1.     Refinancing the Prior Bordetsky Loan into the First Mortgage Loan within the first 12 months of origination and when this refinancing was not in the best interest of Charron, in violation of Regulation Z, 12 C.F.R. § 226.34(a)(3);

2.     Failing to provide Charron with the disclosures required by 15 U.S.C.S § 1639(a) (the "HOEPA Disclosures") at least three days prior to consummation of the First Mortgage Loan and the Second Mortgage Loan as required by 15 U.S.C.S. § 1639(b);

3.     Collecting in advance from the proceeds of the First Mortgage Loan an amount equal to 15 payments and from the Second Mortgage Loan an amount equal to 12 payments in violation of 15 U.S.C.S. § 1639(g) and Regulation Z, 12 C.F.R. § 226.32(s)(3);

4.     Including prohibited "due on demand" provisions in the First Mortgage Loan and in the Second Mortgage Loan in violation of Regulation Z, 12 C.F.R. § 226.32(d)(8);

5.     Engaging in a pattern and practice of extending credit without regard repayment ability in violation of 15 U.S.C.S. § 1639(h); and

6.     Failing to include mandatory disclosures including the amount borrowed, the number of regular monthly payments owing on the loans, or the amount due date of the balloon payments in the HOEPA disclosures for the First Mortgage Loan and the Second Mortgage Loan as required by Regulation Z, 12 C.F.R. §§ 226.18(g), 226.32(c)(3), (5), and 12 U.S.C.S. § 1639(b).

Charron requests relief in the form of rescission and damages against Bordetsky, pursuant to 15 U.S.C.S. § 1640, and against the Third-party Defendants, pursuant to 15 U.S.C.S. § 1641. For the most part, any liability of the Third-party Defendants turns on the actions of Bordetsky in extending the First and Second Mortgage Loans to Charron. For brevity, the court will refer only to Bordetsky in its discussion of HOEPA and the Code.

14

1. Refinancing the Prior Bordetsky Loan into the First Mortgage Loan within the first 12 months of origination and when this refinancing was not in the best interest of Charron, in violation of Regulation Z, 12 C.F.R. § 226.34(a)(3)

Charron asserts that Bordetsky violated section 226.34(a)(3) of Regulation Z by refinancing the Prior Bordetsky Loan into the First Mortgage Loan within a one-year period because both loans were high-rate, high-fee loans. Regulation Z does indeed prohibit a creditor from refinancing one high-rate, high-fee mortgage into another high-rate, high-fee mortgage when the consumer's principal dwelling secures the transaction. Regulation Z, 12 C.F.R. §§ 226.32(a), 226.34(a)(3). Both mortgages must be subject to the requirements of section 226.32 in order for this prohibition to apply. *See* Regulation Z, 12 C.F.R. § 226.34(a).

Bordetsky argues that the Prior Bordetsky Loan was not subject to section 226.32 because it was a residential mortgage transaction that financed Charron's initial acquisition of the Wells property from her mother's estate. *See* Regulation Z, 12 C.F.R. § 226.32(a)(2) (excluding residential mortgage transactions from the requirements of section 226.32). A residential mortgage transaction is "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of that dwelling." 15 U.S.C.S. § 1602(w); *accord* 9-A M.R.S. § 8-103(H) (defining residential mortgage transaction with identical language as the federal statute).

Although Charron contends that she acquired an interest in the Wells property by operation of law when her mother passed away, the court disagrees. Charron did not acquire any interest in the Wells property in her individual capacity until the closing of the Prior Bordetsky Loan when she, acting in her capacity as the Estate's representative, deeded to herself as an individual and her brother a joint interest in the Wells property. The court finds and concludes

15

that the Prior Bordetsky Loan was a residential mortgage transaction and was not subject to section 226.32 of Regulation Z. Because the Prior Bordetsky Loan was a residential mortgage transaction, Bordetsky did not violate the prohibition on refinancing one high-rate, high-fee mortgage into another high-rate, high-fee mortgage.

> 2. <u>Failing to provide Charron with the disclosures required by 15 U.S.C.S § 1639(a) (the "HOEPA Disclosures") at least three days prior to consummation of the First Mortgage Loan and the Second Mortgage Loan as required by 15 U.S.C.S. § 1639(b)</u>

Bordetsky admitted in his Answer to Charron's counterclaims that the First Mortgage Loan and Second Mortgage Loan are high-rate, high-fee mortgages within the meaning of HOEPA. *See* 15 U.S.C.S. § 1602(aa) (defining a high-rate, high-fee mortgage); 9-A M.R.S. § 8-103(F-1) (defining a high-rate, high-fee mortgage as one subject to HOEPA). As of the date on which each of the Loans were closed, May 9, 2006, for the First Mortgage Loan, and July 30, 2007, for the Second Mortgage Loan, 15 U.S.C.S. § 1639(b) required that the disclosures for high-rate, high-fee mortgages be made to three days in advance of the consummation of the transaction. *See also* Regulation Z, 12 C.F.R. § 226.32(c); 9-A M.R.S. § 8-206-A(3). Bordetsky stipulated that these disclosures were not provided to Charron until the day of the closing on each transaction. (Stip. ¶¶ 19, 24; Exhs. F, R.) Thus, the court concludes that Bordetsky failed to comply with the three-day disclosure requirement of 15 U.S.C.S. § 1639(b) for the both the First and Second Mortgage Loans.

> 3. <u>Collecting in advance from the proceeds of the First Mortgage Loan an amount equal to 15 payments and from the Second Mortgage Loan an amount equal to 12 payments in violation of 15 U.S.C.S. § 1639(g) and Regulation Z, 12 C.F.R. § 226.32(s)(3)</u>

Charron asserts that Bordetsky impermissibly consolidated more than two periodic payments on both the First and Second Mortgage Loans and paid them to himself from the loan

16

proceeds in advance by creating the escrow accounts that were associated with each loan transaction. *See* 15 U.S.C.S. § 1639(g); 9-A M.R.S. § 8-206-A(11).[15] The Bankruptcy Court for the Southern District of Texas confronted a similar loan and escrow agreement in *Harmon v. Lighthouse Capital Funding, Inc. (In re Harmon)*, 444 B.R. 696 (Bankr. S.D. Tex. 2011). In *Harmon*, the lender loaned a sum of money ($986,992.06) to the borrower to pay off a lien and an additional sum that represented all the interest due over the 12-month course of the loan ($177,715.83). *Id.* at 701-02. As in the present case, the lender and borrower in *Harmon* executed an escrow agreement that "provided that the $177,715.83 would be held in escrow by [the lender], and that $14,800.32 would be deducted from the escrow account each month in order to satisfy the monthly payment due to [the lender]." *Id.* at 702 n.8. The borrowers challenged the escrow account as a violation of 15 U.S.C.S. 1639(g), but the court never addressed "the more difficult question" of whether the escrow agreement itself violated TILA. *See id.* at 716 n.25. The court did not address this question because the lender never established an escrow account, and the $177,715.83 that should have been placed in escrow was deemed to have been applied by the lender as an "interest prepayment at the time the loan closed" in violation of section 1639(g). *See id.* at 702 n.8, 716-17..

In the present case, the parties have stipulated that monthly payments due under the First and Second Mortgage Loans were paid out of the escrow accounts as they came due on a monthly basis to Bordetsky through his counsel. (Stip. ¶¶ 18, 23.) Because of this stipulation, the court concludes that the funding of the escrow accounts with loan proceeds is not a consolidation of more than two periodic payments paid in advance from either loan's proceeds, and therefore that the escrow did not violate HOEPA.

---

[15] Title 15 U.S.C.S. 1639(g) (LexisNexis 2005) prohibits a high-rate, high-fee mortgage from including "terms under which more than 2 periodic payments required under the loan are consolidated and paid in advance from the loan proceeds provided to the consumer." Title 9-A M.R.S. § 8-206-A(11) (2006) contains identical language.

4. Including prohibited "due on demand" provisions in the First Mortgage Loan and in the Second Mortgage Loan in violation of Regulation Z, 12 C.F.R. § 226.32(d)(8)

Charron avers that Bordetsky included "due on demand" provisions in both the First and Second Mortgage Loans in violation of section 226.32(d)(8) of Regulation Z, which prohibits a high-rate, high-fee mortgage from including

[a] demand feature that permits the creditor to terminate the loan in advance of the original maturity date and to demand repayment of the entire outstanding balance, except in the following circumstances:

(i) There is fraud or material misrepresentation by the consumer in connection with the loan;

(ii) The consumer fails to meet the repayment terms of the agreement for any outstanding balance; or

(iii) There is any action or inaction by the consumer that adversely affects the creditor's security for the loan, or any right of the creditor in such security.

Regulation Z, 12 C.F.R. § 226.32(d)(8); cf. 9-A M.R.S. § 8-206-A(16-B) (prohibiting a "call provision that permits the creditor, in its sole discretion, to accelerate the indebtedness"). The First and Second Mortgage Loans provide that any default of the Note is a default of the mortgage and the "Lender may require that [Charron] pay immediately the entire then remaining unpaid under the Note and under this Mortgage." (Exh. J, ¶¶ 20-21; Exh. V, ¶¶ 20-21.) Because any default of the note is also a default of the mortgage, the court considers the provisions within the First and Second Mortgage Notes to be within the purview of section 226.32(d)(8).

The First Mortgage Note and the Second Mortgage Note contain the following identical default provisions:

I will be in default under this Note if:

. . . .

18

5)    In your judgment, there is a significant impairment of my ability to perform my obligations under this Note or any agreement which secures my obligations under this Note; or

6)    In your judgment, there is a significant impairment of your ability to recover the amounts outstanding under this Note from any property which secures my obligations under this Note.

(Exh. I, § 6(B)(5)-(6); Exh. U, § 6(B)(5)-(6).) Both these provision clearly fall within subsection (iii), "action or inaction by the consumer that adversely affects the creditor's security for the loan." Regulation Z, 12 C.F.R. § 226.32(d)(8)(iii). The reference to "[i]n your judgment" admittedly could be interpreted to vest some degree of discretion in Bordetsky, but this court concludes that the phrase ultimately does not render the provision invalid. Without the phrase, Bordetsky would still be called on to make a "judgment" about impairment; with or without the phrase, his discretion is not unfettered, but must be based on evidence of impairment. The court thus concludes that the due on demand clauses in the First and Second Mortgage Notes do not violate the prohibitions within Regulations Z.[16]

5.    Engaging in a pattern and practice of extending credit without regard to repayment ability in violation of 15 U.S.C.S. § 1639(h)

Charron alleges that Bordetsky habitually and repeatedly extended credit to her without any regard for ability to repay the debt. The relevant HOEPA provision states: "A creditor shall not engage in a pattern or practice of extending credit to consumers under mortgages referred to in [15 U.S.C.S. § 1602(aa)] based on the consumers' collateral without regard to the consumers'

---

[16] The court notes that the Code counterpart to this provision contains a different standard. Title 9-A M.R.S. § 8-206-A(16-B) (2006) states that "[a] high-rate, high-fee mortgage may not include a call provision that permits the creditor, in its sole discretion, to accelerate the indebtedness." "This subsection does not apply when repayment of the loan is accelerated by a bona fide default, pursuant to a due-on-sale provision or pursuant to another provision of the loan agreement unrelated to the payment schedule, but not limited to, bankruptcy or receivership." *Id.* Neither of the due on demand provisions in the First and Second Mortgage Notes comes within the exceptions to section 8-206-A(16-B), i.e. a bona fide default, a due on sale clause, or a loan provision unrelated to payment. Had the substantive Code provision applied here, this court would have had to decide whether the phrase "in your judgment" as used in the First and Second Mortgage Notes vested Bordetsky with "sole discretion" as used in section 8-206-A(16-B). Sole discretion is "[a]n individual's power to make decision without anyone else's advice or consent." Black's Law Dictionary 499 (8th ed. 2004).

19

repayment ability, including the consumers' current and expected income, current obligations, and employment." 15 U.S.C.S. § 1639(h). The provision of Regulations Z on point similarly states that a creditor may not

> [e]ngage in a pattern or practice of extending credit subject to § 226.32 to a consumer based on the consumer's collateral without regard to the consumer's repayment ability, including the consumer's current and expected income, current obligations, and employment. There is a presumption that a creditor has violated this paragraph (a)(4) if the creditor engages in a pattern or practice of making loans subject to § 226.32 without verifying and documenting consumers' repayment ability.

Regulation Z, 12 C.F.R. § 226.34(a)(4). The Federal Reserve Board's Official Commentary to this provision provides:

> *Paragraph 34(a)(4) Repayment ability.*
>
> 1. *Income.* Any expected income can be considered by the creditor, <u>except equity income that would be realized from collateral</u>. For example, a creditor may use information about income other than regular salary or wages such as gifts, expected retirement payments, or income from self-employment, such as housecleaning or childcare.
>
> 2. *Pattern or practice of extending credit—repayment ability.* Whether a creditor is engaging or has engaged in a pattern or practice of violations of this section depends on the totality of the circumstances in the particular case. While a pattern or practice is not established by isolated, random, or accidental acts, it can be established without the use of a statistical process. In addition, a creditor might act under a lending policy (whether written or unwritten) and that action alone could establish a pattern or practice of making loans in violation of this section.

Regulation Z, 12 C.F.R. pt. 226, Supp. I at 502-03 (underline emphasis added). Regulation Z does not distinguish between a borrower's ability to make monthly payments and the borrower's ability to pay any balloon payment.

Based on the evidence at trial, the court makes the following findings. At the time of the Prior Bordetsky Loan, Charron had no ability to pay the $1787.50 monthly payments apart from the funds in the escrow account. At the time of the First Mortgage Loan, Charron had no ability

to pay $2475 per month apart from the funds in the escrow account. At the time of the Second Mortgage Loan, Charron had no ability to pay the now combined monthly payment of $3033.33 ($2475 + $558.33) apart from the funds in the escrow account. Charron had no other assets other than the Wells property.

Bordetsky testified that he extended each loan in order to allow Charron and her brother time to sell the Wells property, but he never verified Charron's or her brother's income. In fact, Bordetsky knew at each time he extended credit to Charron that she had *no* ability to repay other than the funds in the escrow accounts, which were funded from the proceeds of each loan, without selling the property. Further, Bordetsky's failure to verify Charron's and her brother's incomes is consistent with his practice in other cases. Bordetsky testified that he generally does not verify a borrower's income and only requires proof of the value of the assets he is taking as collateral. As Bordetsky averred in a separate proceeding: "I do not require proof of income or assets (other than the real estate provided as collateral) in order to make my loans." Supplemental Affidavit of David Bordetsky in Support of Plaintiff's Motion for Summary Judgment at 7, *Bordetsky v. Nixon*, Docket No. BCD-RE-08-35 (Me. Dist. Ct. Aug. 15, 2008).[17]

The court finds, based on the evidence presented at trial, that it was Bordetsky's practice *not* to verify borrowers' income or repayment ability. The court also finds that Bordetsky has not overcome the presumption within Regulation Z, 12 C.F.R. § 226.34(a)(4), that "a creditor has violated this paragraph (a)(4) if the creditor engages in a pattern or practice of making loans subject to § 226.32 without verifying and documenting consumers' repayment ability." At each of the three times Bordetsky lent money to Charron, he knew that she had no ability to repay him other than with the equity within the house or with the money he lent her. As noted above, "equity income that would be realized from collateral" cannot be considered in establishing a

---

[17] This affidavit was read into the record at trial.

21

borrower's ability to repay. *See* Regulation Z, 12 C.F.R. pt. 226, Supp. I at 502-03. Likewise, funds lent to a borrower in order to make the first year of payments cannot be counted in evaluating the borrower's repayment ability. The court concludes that Bordetsky violated 15 U.S.C.S. § 1639(h) in both the First and Second Mortgage Loan transactions.[18]

6.  Failing to include mandatory disclosures including the amount borrowed, the number of regular monthly payments owing on the loans, or the amount due date of the balloon payments in the HOEPA disclosures for the First Mortgage Loan and the Second Mortgage Loan as required by Regulation Z, 12 C.F.R. §§ 226.32(c)(3), 226.32(c)(5), and 12 U.S.C.S. § 1639(b)[19]

The HOEPA disclosures are those required for high-rate, high-fee mortgages in 15 U.S.C.S. § 1639(a); *see also* Regulation Z, 12 C.F.R. § 226.32(c)(3), and must be made three days in advance of the consummation of the transaction, *see* 15 U.S.C.S. § 1639(b). In conspicuous type size, a high-rate, high-fee mortgage creditor must provide the following disclosures:

(A) "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.".

---

[18] The court's conclusion would be the same under the Code. The Code states: "A creditor may not engage in a pattern or practice of extending credit to a consumer under a high-rate, high-fee mortgage based on the consumer's collateral without regard to the consumer's repayment ability, including the consumer's current and expected income, current obligations and employment." 9-A M.R.S. § 8-206-A(12) (2006). There is a tension between the Code and Regulation Z as to how the court evaluates repayment ability. The Code section refers to "a consumer," "the consumer," and "the consumer's" when discussing repayment ability, indicating that the relevant inquiry is whether there has been a pattern or practice of disregarding repayment ability of an *individual* consumer: Charron. *See* 9-A M.R.S. § 8-206-A(12). Regulation Z, however, refers to "consumers' repayment ability," indicating that the relevant inquiry is to the creditor's pattern or practice with regards to many consumers, and not just Charron. *See* Regulation Z, 12 C.F.R. § 226.34(a)(4) (2007); *cf. Newton v. U.S. Fin. Corp.*, 24 F. Supp. 2d 444, 451-57 (E.D. Penn. 1998) (evaluating HOEPA repayment ability requirement based on lender's practice to all customers in a given period). Regardless, the court's finding the Bordetsky's practice was not to verify borrowers' income or repayment ability would compel the court to conclude that Bordetsky violated 9-A M.R.S. § 8-206-A(12).

[19] Charron includes section 226.18 of Regulation Z as a source of required HOEPA disclosures. That section, however, deals with the TILA disclosures required for all closed-end credit transaction, and not the additional HOEPA disclosures required for high-rate, high-fee mortgages. Because the gravamen of Charron's allegation relates to HOEPA, the court does not address the required TILA disclosures.

(B) "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.".

15 U.S.C.S. § 1639(a); *accord* 9-A M.R.S. § 8-206-A(1). For high-rate, high-fee loans, the creditor must also disclose the annual percentage rate of the loan, the amount of the regular monthly payment, and the amount of any balloon payment. Regulation Z, 12 C.F.R. § 226.32(c)(1)-(3); *accord* 9-A M.R.S. § 8-206-A(2)(A).[20] Unlike the TILA disclosures, which must be made together on a single form, *see* Regulation Z, 12 C.F.R. § 226.17(a)(1), the HOEPA disclosures need only be made clearly and conspicuously in a form, which the consumer can retain. *See* Regulation Z, 12 C.F.R. § 226.31(b).

The HOEPA Disclosures, which Bordetsky made on the dates of the closings of the Loans, did include all of the high-rate, high-fee required disclosures. The required notice, as well as the annual percentage rate, and the amount of the monthly payment were set forth both in numbered paragraph 11 of the Commitment Letter and a separate Disclosure provided by Bordetsky to the Charrons at the closings. (Stip. ¶¶ 19, 24; Exhs. E, F, Q, R.) Additionally, the amount of the balloon payment and the amount borrowed were disclosed in the Federal Truth-in-Lending Disclosure Statements and in the Promissory Notes for these Loans. (Stip. ¶¶ 19, 24; Exhs. H, I, T, U.) Finally, the amount borrowed and the amount of the monthly payment were set forth both in numbered paragraphs 1 and 3 of the Commitment Letter. (Stip. ¶¶ 19, 24, Exhs. E, F, Q, R.) Therefore, Bordetsky made the disclosures required by HOEPA, albeit not in a timely fashion.

---

[20] The required balloon payment disclosure is not part of the high-rate, high-fee disclosure requirements listed in the Code. *See* 9-A M.R.S. §§ 8-206-A(1), (2) (2006). However, the federal regulation that Maine adopted through Regulation Z-2 requires the creditor to disclose "[t]he amount of the regular monthly (or other periodic) payment and the amount of any balloon payment" for high-rate, high-fee mortgages. *See* Regulation Z, 12 C.F.R. § 226.32(c)(3) (2007). Section 5 of Regulation Z-2 states that "this State's regulations interpreting Truth-in-Lending principles must be at least as protective as federal Regulation Z," and thus the disclosures would be the same under the Code.

## B.    COUNT II - CODE VIOLATIONS

In her second counterclaim (the "Second Counterclaim") Charron asserts that the First

Mortgage Loan and the Second Mortgage Loan violate the provisions of the Code by:

1. Failing to provide Charron with the disclosures required by 9-A M.R.S. § 8-206-A(1) (the "High-Rate Disclosures") at least three days prior to consummation of the First Mortgage Loan and the Second Mortgage Loan;

2. Failing to take action necessary appropriate to reflect the termination of the mortgages securing the First Mortgage Loan and the Section Mortgage Loan within 20 days after the Defendant's rescission of those loans;

3. Collecting in advance from the proceeds of the First Mortgage Loan and from the proceeds of the Second Mortgage Loan an amount equal to more than two monthly payments in violation of 9-A M.R.S. § 8-206-A(11)[21]; and

4. Failing to report the Charrons payment history to a nationally recognized consumer reporting agency as required by 9-A M.R.S. § 8-206-A(11-A).

As a remedy, Charron seeks damages by way or recoupment or setoff, interest, costs, and

reasonable attorney fees against Bordetsky, pursuant to 9-A M.R.S. § 8-208, and against

Third-party Defendants, pursuant to 9-A M.R.S. § 8-209.

Title 15 U.S.C.S. § 1610 deals with the preemptive effect of TILA. It states that the

provisions within Chapter 1, 2, and 3 of TILA, 15 U.S.C.S. §§ 1601-1665b, "do not annul, alter,

or affect the laws of any State relating to the disclosure of information in connection with credit

transactions, except to the extend that those laws are inconsistent with the provisions of this title,

and then only to the extent of the inconsistency." 15 U.S.C.S. § 1610(a)(1). Regulation Z

explains:

### § 226.28  Effect on State laws.

(a) *Inconsistent disclosure requirements.* (1) Except as provided in paragraph (d) of this section, State law requirements that are inconsistent with the requirements contained in chapter 1 (General Provisions), chapter 2 (Credit

---

[21] This provision was repealed, *see* P.L. 2007, ch. 273, § A-10 (effective Jan. 1, 2008), and then reenacted and codified at 9-A M.R.S. § 8-206-H(1)(A)(4) (2010), *see* P.L. 2009, ch. 362, § A-12 (effective June 11, 2009).

Transactions), or chapter 3 (Credit Advertising) of the act and the implementing provisions of this regulation are preempted to the extent of the inconsistency. A State law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law. A State law is contradictory if it requires the use of the same term to represent a different amount or a different meaning than the Federal law, or if it requires the use of a term different from that required in the Federal law to describe the same item.

Regulation Z, 12 C.F.R. § 226.28; *accord Orr v. Ameriquest Mortg. Co. (In re Hollis)*, No. 07-22759 (KCF), Adversary No. 07-2615, 2009 Bankr. LEXIS 3020, at *36 (Bankr. D.N.J. Sept. 17, 2009) ("Congress only intended to preempt state laws that conflict with provisions of TILA").

The first three provisions of the Code that Charron avers Bordetsky violated, the three-day notice requirement of 9-A M.R.S. § 8-206-A(3), the rescission procedures within 9-A M.R.S. § 8-204(2), and the ban on collecting more than two monthly payments in advance from the loan's proceeds within 9-A M.R.S. § 8-206-A(11), are identical to their federal counterparts, *see* 15 U.S.C.S. § 1639(b); 15 U.S.C.S. § 1635(b); 15 U.S.C.S. § 1639(g), and thus consistent with TILA and not preempted.

The last Code provision Charron avers Bordetsky violated imposes a requirement on creditors not found within TILA or HOEPA: "[a] creditor who makes a high-rate, high-fee mortgage shall report both the favorable and unfavorable payment history of the consumer to a nationally recognized consumer credit reporting agency at least annually during the period the creditor holds or services the loan." 9-A M.R.S. § 8-206-A(11-A). The court does not interpret the requirement to be inconsistent with TILA, and thus not preempted. *See* Truth in Lending; Determinations of Effect on Mississippi, New Jersey, Oklahoma, and South Carolina State Laws, Docket. No. R-0466, 48 Fed. Reg. 43,672 (Sept. 23, 1983) ("A state law is not inconsistent [with

25

TILA] merely because it requires more information than federal law or requires disclosure in transactions where federal law requires none.").

1. Failing to provide Charron with the disclosures required by 9-A M.R.S. § 8-206-A(1) (the "High-Rate Disclosures") at least three days prior to consummation of the First Mortgage Loan and the Second Mortgage Loan

In its HOEPA analysis, the court has already concluded that Bordetsky failed to comply with the three-day disclosure requirement of 15 U.S.C.S § 1639(b), which contains identical provisions to 9-A M.R.S. § 8-206-A(3). The court thus concludes that Bordetsky has also violated the Code in the First and Second Mortgage Loan transactions.

2. Failing to take action necessary appropriate to reflect the termination of the mortgages securing the First Mortgage Loan and the Section Mortgage Loan within 20 days after the Defendant's rescission of those loans

Title 9-A M.R.S. § 8-204(2) provides that "[w]ithin 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." As discussed *infra*, because Charron does not have a right to rescind either the First Mortgage Loan or Second Mortgage Loans, Bordetsky was not obligated to take any action to reflect termination of either mortgage upon receipt of her notice and thus did not violate § 8-204(2).

3. Collecting in advance from the proceeds of the First Mortgage Loan and from the proceeds of the Second Mortgage Loan an amount equal to more than two monthly payments

In its HOEPA analysis, the court has already concluded, based on the stipulations of the parties, that monthly payments due under the First and Second Mortgage Loans were paid out of the escrow accounts as they came due on a monthly basis to Bordetsky through his counsel. (Stip. ¶¶ 18, 23.) Because of this stipulation, the court again concludes that the funding of the

26

escrow accounts with loan proceeds is not a consolidation of more than two periodic payments paid in advance from either loan's proceeds in violation of 9-A M.R.S. § 8-206-A(11).

4. Failing to report Charron's payment history to a nationally recognized consumer reporting agency as required by 9-A M.R.S. § 8-206-A(11-A)

Charron alleges that Bordetsky violated the Code because he did not report her payment history to a national recognized consumer reporting agency. The Code requires that "[a] creditor who makes a high-rate, high-fee mortgage shall report both the favorable and unfavorable payment history of the consumer to a nationally recognized consumer credit reporting agency at least annually during the period the creditor holds or services the loan." 9-A M.R.S. § 8-206-A(11-A). Based on Bordetsky's testimony, the court finds that Bordetsky did not report Charron's payment history to a nationally recognized consumer credit reporting agency. Although Bordetsky avers that he did not do so because his volume of credit transactions was too low to be of interest to the agencies and he should not be required to perform a futile act, the court does not find that the alleged unwillingness of the agencies relieves him of his statutory duty to at least report Charron's payment history. The court thus concludes that Bordetsky violated 9-A M.R.S. § 8-206-A(11-A) in both the First and Second Loan Mortgage transactions.

C. COUNT IV – UTPA VIOLATIONS

Maine's Unfair Trade Practices Act, or UTPA, "provides protection for consumers against unfair and deceptive trade practices. It declares unlawful 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *State v. Weinschenk*, 2005 ME 28, ¶ 11, 868 A.2d 200, 205 (quoting 5 M.R.S. § 207 (2006)). In her fourth counterclaim (the "Fourth Counterclaim"), Charron alleges that Bordetsky has violated Maine's UTPA by:

- Failing to comply with federal and state lending laws;

27

- Selling loans to Charron which Bordetsky knew or should have known would result in foreclosure;

- Selling loans to Charron without regard to her ability to repay those loans;

- Engaging in a pattern or practice of extending high cost, high fee home loans to consumers without regard to ability to repay the loan;

- Not providing Charron with notice of the costs and fees of the First Mortgage Loan and of the Second Mortgage Loan prior to the date of the closing of these loans; and

- Extending high fee, high cost loans to Charron without giving adequate prior notice or warning regarding the terms of the loans prior to closing; and

- Holding himself out as a licensed mortgage banker and failing to underwrite the First Mortgage Loan and the Second Mortgage Loan in accordance of the documents he submitted to the Bureau of Consumer Credit Protection pursuant to his application for a mortgage banker license.

As relief, Charron requests damages, attorney fees, and other equitable relief.

### 1. Applicability of UTPA to the transactions at issue

Bordetsky, relying on *First Maine Commodities v. Dube*, 534 A.2d 1298 (Me. 1987), contends that UTPA does not apply to the transactions at issue because the transactions were subject to the Code. In *Dube,* the Law Court held that a real estate broker's activities were exempt from UTPA because "by statute the Maine Real Estate Commission extensively regulates brokers' activities," and because the statutory restrictions expressly governing licensed brokers permitted the type of contract at issue in that case. *See id.* at 1301, 1302 (citing 32 M.R.S.A. § 4004, which governed and permitted the kind of agreement at issue in *Dube*). The Court relied primarily on section 208(1) of UTPA, which contained the following exception from its scope: "Nothing in this chapter shall apply to . . . [t]ransactions or actions otherwise permitted under

laws as administered by any regulatory board or officer acting under statutory authority of the State or of the United States." 5 M.R.S. § 208(1) (2006).[22]

Bordetsky asserts that under *Dube,* all transactions that are regulated by an agency are exempt from UTPA, but acknowledges that the interpretation of *Dube* urged by Defendants, has been questioned. *See e.g., Good v. Altria Group, Inc.,* 501 F.3d 29 (1st Cir. 2007); *Provencher v. T&M Mortgage Solutions, Inc.,* Docket No. 08-31-P-H, 2008 U.S. Dist. LEXIS 47616 (D. Me. June 18, 2008). A plain reading of the statute, however, indicates that the provisions of UTPA do not apply to "transactions or actions *otherwise permitted*" under the laws "administered by any regulatory board or officer." 5 M.R.S. § 208(1) (emphasis added). Thus, if conduct or a transaction is not permitted by the Code, it is not protected by the UTPA exception. This interpretation is consistent with the First Circuit's holding in *Good,* which explained that the Law Court's holding in *Dube* is reasonably construed to mean that a transaction is exempt from UTPA "where it is subject to specific standards left to the enforcement of an administrative agency," *and* when the transaction/conduct is permitted under those regulatory standards. 501 F.3d at 58. The court concludes that the exception does not apply and these transactions are subject to UTPA.

### 2.    Unfair and Deceptive Acts by Bordetsky

---

[22] Effective September 20, 2007, the statutory exception was amended to read:

Nothing in this chapter shall apply to:

**1. Regulatory boards.** Transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the State or of the United States. This exception applies only if the defendant shows that:

**A.** Its business activities are subject to regulation by a state or federal agency; and

**B.** The specific activity that would otherwise constitute a violation of this chapter is authorized, permitted or required by a state or federal agency or by applicable law, rule or regulation or other regulatory approval.

5 M.R.S. § 208 (2011); *see* P.L. 2007, ch. 222 § 1 (effective Sept. 20, 2007).

As noted, UTPA declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S. § 207. UTPA does not define the terms "unfair" or "deceptive." *State v. Weinschenk*, 2005 ME 28, ¶ 15, 868 A.2d at 206. Therefore, "[i]n determining what constitutes an unfair or deceptive act pursuant to the UTPA," Maine courts "are guided by the interpretations given by the Federal Trade Commission (FTC) and the federal courts." *Id.* "Determination of whether an act or practice is 'unfair or deceptive' in violation of the UTPA must be made by the fact-finder on a case-by-case basis." *Weinschenk*, 2005 ME 28, ¶ 15, 868 A.2d at 206.

"To justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition." *Id.* ¶ 16, 868 A.2d at 206; *accord Bangor Publ'g Co. v. Union St. Mkt.*, 1998 ME 37, ¶ 7 ,706 A.2d 595, 597.

> An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances. A material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product. An act or practice may be deceptive, within the meaning of Maine's UTPA, regardless of a defendant's good faith or lack of intent to deceive.

*Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d at 206 (quotation marks and citations omitted). Any unfair or deceptive act must be substantial in order for a plaintiff to recover damages. *See Bangor Publ'g Co. v. Union St. Mkt.*, 1998 ME 37, ¶ 7 ,706 A.2d at 597.

The court concludes that Charron has failed to meet her burden on her UTPA claims. She has not explained how Bordetsky's alleged violations are either unfair or deceptive. Nor has Charron articulated how each instance caused substantial injury to her or to consumers as a

30

whole. Finally, notwithstanding the deficiency in pleading and proof, the court is not convinced that even if any of the alleged violations were unfair, the unfairness is not "outweighed by any countervailing benefits to consumers or competition." *Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d at 206.

III.    REMEDIES

    A.    RESCISSION

Charron seeks rescission of both the First and Second Mortgage Loans pursuant to the federal statute, 15 U.S.C.S. § 1635; Charron does not seek the remedy of rescission pursuant to the Code. (Countercl. at 9-10.) It remains an open question as to whether a consumer within a state that has received a TILA exemption, such as Maine, may seek rescission under federal law, or must bring the claim under state law, *see Belini*, 412 F.3d at 30, that concern is obviated by the Law Court's decision in *Pelletier*. Based on the *Pelletier* decision, and on the nearly identical rescission remedies in TILA and the Code, the court concludes that Charron can, in the first instance, at least assert a claim for rescission under the federal statute. *See Pelletier*, 2011 ME 87, ¶ 9 n.4, -- A.3d at --- (noting that the federal TILA rescission provisions are identical to Maine's Code rescission provisions).

15 U.S.C.S. § 1635 permits rescission "in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended." Timing of rescission is governed by 15 U.S.C.S. § 1635(f) and Regulation Z, 12 C.F.R. § 226.23, which provide that a

> consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first.

31

Regulation Z, 12 C.F.R. § 226.23(a)(3); *accord* 9-A M.R.S. § 8-204(6) ("An obligor's right of rescission expires 3 years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first"). Charron's counsel sent a notice of rescission of the First and Second Mortgage Loans on January 26, 2010. (Stip. ¶ 44; Exh. JJ.) Applying the three-year statute of repose to the First Mortgage Loan, the attempted rescission occurred more than three years after its consummation on May 9, 2006, and thus is barred.[23]

The only transaction eligible for rescission is the Second Mortgage Loan,[24] which closed on July 30, 2007, and only if Bordetsky never delivered all of the required material disclosures. *See* Regulation Z, 12 C.F.R. § 226.23(a)(3); *accord* 9-A M.R.S. § 8-204(1). Material disclosures are "the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total payments, the payment schedule, and the disclosures and limitations referred to in § 226.32(c) and (d)." Regulation Z, 12 C.F.R. § 226.23(a)(3) n.48. The court has already concluded that Bordetsky made all the required HOEPA disclosures: the notices within

---

[23] Charron does not argue that the court should apply the doctrine of equitable tolling to the three-year statute of repose.

[24] The Second Mortgage Loan is not exempted from rescission by virtue of 15 U.S.C.S. § 1635(e), which provides that rescission is not available for:

> A.    a residential mortgage transaction, as defined in section 103(w)[, meaning a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling];
>
> B.    a transaction which constitutes a refinancing or consolidation (with no new advances) of the principal balance then due and any accrued and unpaid finance charges of an existing extension of credit by the same creditor secured by an interest in the same property;
>
> C.    a transaction in which an agency of a State is the creditor; or
>
> D.    advances under a preexisting open end credit plan if a security interest has already been retained or acquired in conformance with this section and such advances are in accordance with a previously established credit limit for such plan.

*Accord* 9-A M.R.S. § 8-204(5) (2006) (containing nearly identical language for transactions exempted from rescission under the Code).

Regulation Z, 12 C.F.R. § 226.32(c)(1); the annual percentage rate within Regulation Z, 12 C.F.R. § 226.32(c)(2); the regular payment and the balloon payment, *see* Regulation Z, 12 C.F.R. § 226.32(c)(3); and the amount borrowed within Regulation Z, 12 C.F.R. § 226.32(c)(4). Thus, Charron only has a right to rescind the Second Mortgage Loan if Bordetsky violated one of the limitations in Regulation Z, 12 C.F.R. § 226.32(d). The only potential limitation found within the Second Mortgage Loan is a due on demand clause, which the court has already concluded is not in violation of Regulation Z, 12 C.F.R. § 226.32(d)(8). Because the Second Mortgage Loan does not violate any of the provisions within Regulation Z, 12 C.F.R. § 226.32(c)-(d), Charron does not have a right to rescind the mortgage against Bordetsky, nor does she have any right of rescission against the purported assignees pursuant to 15 U.S.C.S. § 1641(c).[25]

The court also concludes that even if Charron had been entitled to rescind the Second Mortgage Loan, for the court to permit Charron an opportunity to effectuate rescission would be a futile act. In its recent *Pelletier* opinion, the Law Court noted that "the relevant TILA statute contemplates the parties' return to their pre-contract circumstances through the mutual return and tender of funds and property," *Deutsche Bank National Trust Co. v. Pelletier*, 2011 ME 87, ¶ 12, -- A.3d at ---. Throughout this case, Marlene Charron has acknowledged that she has no ability to make payment on her obligations to Bordetsky without selling her interest in the property.

---

[25] The court notes that the analysis under the Code would be largely the same. The attempted rescission of the First Mortgage Loan is time barred. *See* 9-A M.R.S. § 8-204(6); Regulation Z, 12 C.F.R. § 226.23(a)(3). Further, the material disclosures required under section 8-204(1) are the same as under section 1635 of the federal statute because of Maine's adoption of Regulation Z in interpreting the Code. *See* Regulation Z, 12 C.F.R. § 226.23(a)(3) n.48. The court does note that the federal and state counterparts differ in their definition of due on demand clauses depending on the remedy sought by the consumer. For example, under the present circumstances a violation of 9-A M.R.S. § 8-206-A(16-B) would qualify Charron for damages under 15 U.S.C.S. § 1640 and 9-A M.R.S. § 8-208(1), but the same violation does not appear to entitle her to rescission under the Code because Regulation Z, which defines the limitations on high-fee, high-rate mortgages entitling a consumer to rescission, does not define prohibited due on demand clauses identically to the Code. Nevertheless, even if the due on demand prohibition within the Code were to apply, the court would likely still not grant rescission because of her inability to effectuate the necessary steps to accomplish rescission.

Because she cannot do her part in restoring the parties to their pre-contract circumstances, rescission is not an appropriate remedy.[26] *See id.*

## B.   DAMAGES

In addition to rescission, Charron asserts claims for damages for HOEPA and Code violations.  The court will first address damages under HOEPA, and then damages under the Code.

### 1.   Damages pursuant to 15 U.S.C.S. § 1640

Pursuant to section 1640(a), when a creditor

fails to comply with any requirement imposed under [15 U.S.C.S. §§ 1631-49] . . . with respect to any person is liable to such person in an amount equal to the sum of—

   (1) any actual damage sustained by such person as a result of the failure;

   (2)(A) (i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under chapter 5 of this title [15 USCS §§ 1667 et seq.], 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $ 100 nor greater than $ 1,000, or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $ 2,,000; or
   (B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $ 500,,000 or 1 per centum of the net worth of the creditor;

   (3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 125 [15 USCS § 1635], the costs of the action, together with a reasonable attorney's fee as determined by the court; and

---

[26] Another factor in the analysis is, that even if Charron had some actual ability to restore Bordetsky to the *status quo ante,* the fact that Bordetsky now has title to David Charron's interest in the property would complicate the rescission issue considerably, and perhaps render rescission a rather meaningless remedy for Charron.

> (4) in the case of a failure to comply with any requirement under section 129 [15 USCS § 1639], an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material.

15 U.S.C.S. § 1640(a). An obligor is limited to a single recovery for multiple failures to disclose in one transaction. *See* 15 U.S.C. § 1640(g). An obligor has one year from the occurrence of the violation, i.e. the consummation of the transaction, to bring an action for damages, but the limitation does not limit an obligor "from asserting a violation of [TILA or HOEPA] in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off." 15 U.S.C.S. § 1640(e); *accord* 9-A M.R.S. § 8-208(5). Charron brought her counterclaims past the one-year statute of limitations, but she can still assert damages by way of recoupment in the foreclosure action. Thus, the court must first assign a damage value to each of the HOEPA violations it has found, and the sum of those amounts will serve as recoupment against any recovery by Bordetsky in the foreclosure.

Charron has not asserted any actual damages from Bordetsky's HOEPA violations and thus the court awards no damages under section 1640(a)(1). With regards to section 1640(a)(2), the court has found two HOEPA violations related to the First Mortgage Loan and two HOEPA violations related to the Second Mortgage Loan. The court awards $1000 in damages for each violation by way of recoupment, resulting in an award of damages in the amount of $2000 for the First Mortgage Loan and $2000 for the Second Mortgage Loan.

In addition, Bordetsky's violation of 15 U.S.C.S. § 1639(h) by engaging in a pattern or practice of extending credit to Charron under high-rate, high-fee mortgages without regard to her ability to repay, entitles Charron to enhanced statutory damages pursuant to 15 U.S.C.S. § 1640(a)(4). Although Bordetsky argues that the violation of section 1639(h) is not "material," the court disagrees. Had Bordetsky not continued to extend credit to Charron regardless of her

ability to repay, Charron would be in a better financial situation than she is now, with less debt an thus more equity in her home. The court fails to see how such a violation is not material.

Section 1640(a)(4) entitles Charron to "an amount equal to the sum of all finance charges and fees paid by the consumer." The only eligible fees paid by Charron and her brother are the two $7,500 origination fees paid to Bordetsky at the closing of the First Mortgage Loan and the Second Mortgage Loan. (Stip. ¶¶ 18, 27.) With regards to finance charges, it is undisputed that the only amounts paid to Bordetsky were taken directly from the escrow accounts set up for the First and Second Mortgage Loans. Because both loans were interest-only loans with five-year terms, the monthly payments withdrawn from each escrow account are the total finance charges paid by Charron and her brother. *See* 12 C.F.R. § 226.4(b)(1) (including interest within the definition of finance charge). The amount funded into the First Mortgage Loan Escrow account was $37,125; the amount funded into the Second Mortgage Loan Escrow was $36,399.96. (Stip. ¶¶ 18, 27.) Because Charron and her brother were co-mortgagors, the court can only attribute one half of the amounts of fees and interest to have been paid by Charron.

The court thus awards damages in the amount of: $22,312.50 (($7,500 + $37,125)/2) for violation of 15 U.S.C.S. § 1639(h) related to the First Mortgage Loan; and $21,949.98 (($7500 + $36,399.96)/2) for violation of 15 U.S.C.S. § 1639(h) related to the Second Mortgage Loan.

Finally, because Charron has been successful in her HOEPA claims, she is also entitled to her costs and reasonable attorney fees pursuant to section 1640(a)(3).

### 2.     Damages pursuant to 15 U.S.C.S. § 1641

When "any civil action for a violation of [TILA] which may be brought against a creditor," the same action "may be maintained against any assignee of such creditor only if the violation for which such action . . . is brought is apparent on the face of the disclosure

36

statement." 15 U.S.C.S. § 1641(a). Charron asserts that the Third-party Defendants, who funded Bordetsky's loans in exchange for promissory notes and a security interest in a pro rata portion of the First and Second Mortgage Notes and Loans, are assignees subject to section 1641. The court disagrees. The Third-party Defendants have no ownership interest in the First Mortgage Loan or of the Second Mortgage Loan, but, instead, have taken assignment of those Loans only as collateral for amounts owed to them by Bordetsky. Because the Third-Party Defendants are not assignees for purposes of TILA liability, they have no liability under section 1641.

### 3.     Damages pursuant to 9-A M.R.S. § 8-208

The civil liability provision under the Code is similar to 15 U.S.C.S. § 1640. Any action for civil liability must be brought within one year of the date of the occurrence of the violation, but, similar to the federal provision, the statute of limitations does not apply to a person asserting a violation of the Code in an action to collect a debt "as a matter of defense by recoupment or set-off." *See* 9-A M.R.S. § 8-208(5). Thus, Charron is only entitled to damages in the way of recoupment or set-off for Bordetsky's Code violations because she did not bring the action within a year of the closing of the First or Second Mortgage Loans.

The Code provides, in relevant part, that

any creditor who fails to comply with any requirement imposed under this Article . . . with respect to any person is liable to that person in an amount equal to the sum of:

A.   Any actual damage sustained by such person as a result of the failure;

B.   In an individual action:

(i)   Twice the amount of any finance charge in connection with the transaction; or

(ii)   In the case of a consumer lease, 25% of the total amount of monthly payments under the lease.

37

Liability under this paragraph may not be less than $100 nor greater than $1,000; except that in the case of a credit transaction not under an open-end credit plan that is secured by real property or a dwelling, liability under this paragraph may not be less than $200 nor greater than $2,000;

C. In the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of recision [sic] under section 8-204, the costs of the action, together with a reasonable attorney's fee as determined by the court.

9-A M.R.S. § 8-208(1). The court has found two violations of the Code applicable to both the First and Second Mortgage Loans. *See* 9-A M.R.S. § 8-206-A(1), (11-A). The court awards $1000 in damages for each violation by way of recoupment, resulting in a $2000 award of damages related to the First Mortgage Loan and $2000 award of damages related to the Second Mortgage Loan.

Finally, because Charron has been successful in her Code claims, she is also entitled to her costs and reasonable attorney fees pursuant to section 9-A M.R.S. § 8-208(1)(C).

### 4. Damages pursuant to 9-A M.R.S. § 8-209

The Code provision regarding assignee liability is very similar to 15 U.S.C.S. § 1641. When "any civil action for a violation of [the Code] which may be brought against a creditor," the same action "may be maintained against any assignee of such creditor only if the violation for which such action . . . is brought is apparent on the face of the disclosure statement." 9-A M.R.S. § 8-209(1). Charron's claim against the Third-party Defendants for Code violations suffers from the same impediment as her TILA claims against them: they are not assignees. Because the Third-Party Defendants are not assignees, they have no liability under section 8-209.

### C. REMAINING ISSUES

This Decision and Order stops short of addressing all issues raised in the case, and therefore does not constitute a final judgment. Instead, the court is inviting the parties to submit

proposed judgments, attorney fee affidavits and supporting memoranda on the remaining issues, which the court sees as follows:

1. The amount by which Marlene Charron should be credited as a result of David Charron's deed to Bordetsky in lieu of foreclosure

Marlene Charron is entitled to a credit against her liability for the value received by Bordetsky as a result of obtaining David Charron's deed in lieu of foreclosure. *See* 14 M.R.S. § 13 (2010) ("The amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.")

The initial question becomes, how should that amount be determined? Presumably, because Bordetsky paid $5,000 for the deed in lieu from David Charron, the amount of the credit should be the value of David Charron's interest in the property at the time it was transferred to Bordetsky less the $5,000 payment. However, one or both parties may suggest alternate measures of the credit. It may be that the existing record permits the amount of the credit to be established, or it may be that a further hearing is necessary. A subsidiary question relates to the burden of proof on the issue of the amount. A secondary question is, how should the value be credited—presumably it should operate to reduce the amount of Bordetsky's judgment against Marlene Charron, meaning that any further hearing on the amount of the credit needs to be held before entry of final judgment, but there may be other means.

2. The terms of foreclosure and sale

It seems unlikely that the net effect of the offsets and credits against Marlene Charron's liability (in the form of credit for the deed in lieu and the awards of damages and attorney fees)

39

will be to eliminate her liability entirely. If it does not, then the final judgment will presumably authorize foreclosure and sale. Because Charron has only an undivided half-interest in the property, the sale on foreclosure would be only of that half-interest.

The court requests the parties to submit their positions on the following questions:

- Should Bordetsky be required to market and sell his own half-interest along with Charron's, so as to maximize the proceeds of sale? Can he be so required?

- What special requirements, if any, should the court impose regarding the foreclosure sale of Charron's interest?

- Does Bordetsky presently have standing to foreclose? Assignments of record can be interpreted call his standing into question on the one hand, but the parties have stipulated that he has made out a *prima facie* claim for foreclosure of Charron's interest. If he lacks standing, there may need to be a real party in interest substitution.

### 3. The other terms of the judgment

Any final judgment should contain current amounts due, net out the amounts awarded to Ms. Charron as damages, and reflect any other terms essential to the operation of the judgment. Also, if the court has inadvertently failed to address a significant issue or claim, the parties are requested to bring that omission to the court's attention, although this is not an opportunity to re-argue points addressed in this decision. Lastly, both parties are entitled to submit attorney fee requests. Accordingly, the court will request the parties to submit revised proposed final judgments, incorporating this Decision and Order by reference, along with fee affidavits and memoranda no longer than 15 pages.

40

The clerk will schedule a conference of counsel, which may be telephonic, to discuss a schedule for the submittals requested and for any further proceedings necessitated by this Decision and Order.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this Decision and Order by reference in the docket.

Dated 16 August 2011

_____
A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 8.17.2011
Copies sent via Mail __ Electronically ✓

41